UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SUSAN M. JOYCE
                Plaintiff,

v.                                                Case No.

MILWAUKEE CYLINDER, A Business
Unit of ENERPAC, Which Is Solely Owned By ACTUANT CORP;
AND
INTERNATIONAL ASSOCIATION OF
MACHINISTS, LOCAL 1862
                Defendants.

## COMPLAINT

## INTRODUCTION

1.    This civil rights action seeks damages and is brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. Plaintiff Susan Joyce alleges that she was discriminated against in the terms and conditions of her employment, for participation in an EEO process and for opposition to unlawful practices under this title, and brings this action to remedy violations of her right to employment without discrimination on the basis of sex and retaliation.

## JURISDICTION

2.    This action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* and § 301 of 29 U.S.C. § 185. Jurisdiction is conferred by 28 U.S.C. §§ 1331, 1343(a)(4) and 42 U.S.C. § 2000e-5. Also, pursuant to 42 U.S.C. §§

1985. Venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3).

PARTIES

3. Plaintiff Susan M. Joyce ("Joyce") is an adult resident of the State of Wisconsin, and she currently resides at 3465 S. Kansas Avenue, Milwaukee, Wisconsin, 53207. Her sex is female, and she is in a protected class in this regard. At all times material hereto, Plaintiff was employed at Milwaukee Cylinder and at all times her employment was subject to the terms of the collective bargaining agreement with Union Local 1862 of the International Association of Machinists.

4. Defendant MILWAUKEE CYLINDER is a business unit of defendant ENERPAC, which manufactures equipment, tools, components and systems. ENERPAC is located at N86 W12500 Westbrook Crossing, Menominee Falls, WI; MILWAUKEE CYLINDER operates a facility at 5877 S. Pennsylvania Avenue, Cudahy, WI 53110. ENERPAC is wholly owned by ACTUANT, whose headquarters are in Menominee Falls, WI., N86 12500 Westbrook Crossing, Menomonee, Falls, WI 53051 ("the company").

5. Defendant International Association of Machinists Union Local 1862 ("union") is the union to which Joyce belonged while employed at the company. It is located at 3665 E. Grange Ave., Cudahy, WI 53110.

## FACTUAL ALLEGATIONS

6. Within 300 days of some of the occurrences of which Plaintiff complains, she filed charges of employment discrimination based on sex and also retaliation with the United States Equal Opportunity Commission (EEOC), as cross-filed with her complaints to the State of Wisconsin Equal Rights Division. In these charges, **26G-2014-01240**, (sex discrimination by the company); **26G-2014-00188** (sex discrimination and retaliation by the company) and **26G-2015-00160** (sex discrimination by the union), Plaintiff has timely and fully exhausted all required administrative remedies.

8. On August 16, 2018, the Equal Opportunity Commission issued Dismissal and Notice of Rights on all the cases against the company and the union. This case is timely filed.

9. At all times relevant to this lawsuit, Joyce worked for defendant company from October 3, 1988 until her termination on May 2, 2014.

10. At all times material herein, Joyce was a member of defendant IAM Local 1862, to whom she had paid dues since her hiring.

11. At the time of her termination Joyce was a Thread Roller and Process Group Leader (PGL).

## DISCRIMINATION BY MILWAUKEE CYLINDER

12. During her 25 years at the company, Joyce maintained a superior work record. She was never late or absent without cause, and, prior to the events described herein, never disciplined. She was one of only five women working in the shop at the

company, out of a total of 76 machinists during her time at the company; she was the first woman given the Process Group Lead ("PGL") position within the union, and the only woman PGL in the first shift.

13. Joyce had obtained her job at the company in 1988 as a result of an alleged consent decree entered into with the state of Wisconsin Equal Rights Division requiring the company to hire women.

14. In her position a PGL Joyce was responsible for, *inter alia*, working with the process groups to schedule/plan activities to meet customer demand; facilitating continuous improvement activities, coordinating process improvements and assisting other individuals in the process group in the proper procedures, working to troubleshoot quality issues within the process group and management to determine root causes and foster corrective action plans.

15. John Carpenter ("Carpenter") at all times relevant to this action was an employee of the company, having been hired in 1998, and a union member who was assigned to work in Joyce's PGL area.

16. Joyce and Carpenter had had a romantic relationship for approximately 10 years and it had ended in approximately late 2010 or early 2011. The company and the union knew of the relationship throughout its duration, and there were no rules or opposition to this relationship ever expressed by the company or union.

17. In late 2010, early 2011, Joyce ended the relationship on her own terms, amicably, and she even agreed to take out a mortgage on her home in order to give

Carpenter money which he demanded as a condition of their split. Carpenter agreed to pay that portion of the mortgage payment to repay the money he had gotten out of it.

18. In about 2012, Joyce advised her company supervisor, Tim Dove, of the loan when she reported to him about Carpenter's increasing harassment and hostility towards her, which began to be seriously distracting to Joyce in 2012. The harassment included Carpenter's swearing, calling her names and screaming at her, in front of co-workers and when no one else was around. As Carpenter's PGL, Joyce found her work interfered with and she was increasingly stressed and worried about Carpenter's acting out, which increasingly hampered her ability to do her job and her PGL duties.

19. Despite her complaints to the company and the union, Joyce continued to be assigned to be Carpenter's Process Group Lead ("PGL"), and, in that capacity, Carpenter continued and stepped up his verbal harassment, refusing to cooperate with her as PGL, and yelling at her that "she was not the boss of him."

20. Joyce continued to go to management, including her supervisor, Dove, for assistance. She suggested that Carpenter's work station (the band saw) be moved away from her (it was less than 6 feet away) and that he be placed in another process group.

21. Management refused to help her, and failed to move Carpenter's physical location or to change his PGL group so the parties would not have to communicate. Instead, in February, 2013 Joyce and Carpenter were told to have no "direct contact" with each other. Joyce made every good faith effort to avoid "direct contact" with this man who was in her work group, and she let management know that she felt "between

5

a rock and a hard place," because Carpenter's growing hostility towards her made her job increasingly difficult.

22. Joyce felt stymied in her PGL duties as Carpenter ramped up his attacks on her, including his filing a "harassment" complaint against her in May, 2013. Joyce was told about this "harassment" complaint but was never given a copy of it. She was subjected to innuendo by management that she was "under investigation" even though she asked both union and the company repeatedly to let her see the alleged harassment complaint, but both union and the company refused to show it to her.

23. In 2013 Carpenter ramped up his rude and violent behavior towards Joyce.

24. On July 10, 2013, Carpenter told her to "watch it" because she was going to be moved to second shift, would have her pay cut and he was "going to get her job." Joyce went to her direct supervisor to let him know of the threats, Dove, and nothing came of it, even though Carpenter's threats violated the February order.

25. On July 29, 2013, Joyce turned off a radio at Carpenter's work area during a break time, after he had left the area with the radio playing. There was an unwritten rule: all radios to be turned off at break time. It was a practice accepted act by all employees at break time and involved no direct contact with Carpenter. Joyce was given her first ever suspension, allegedly, for violating the February agreement.

26. On August 2, 2013, Joyce called her supervisor, Dove, to ask for his assistance in getting some tubes produced on the hydraulic lathe, Carpenter's job, to supply to cell 3 assemblers, who were waiting for product to complete jobs due. As directed by

6

management, she asked her supervisor, and had no direct contact with Carpenter.  For this, she was given a three-day layoff.

27. On November 1, 2013, Joyce called Dove, to ask that Carpenter be required to put materials away that were left dangerously at his work station.  Joyce had been injured on July 25, 2013 by a similar action of Carpenter and she was still under treatment for those injuries. She was further distressed by the lack of safety Carpenter was displaying at his workplace. Dove did not respond by calling Carpenter.  Instead he came to her area with three union stewards and proceeded to say that Joyce was in violation of an order to not have contact with Carpenter.  She was given a five day layoff.

28.  At all times from February, 2013 to November 1, 2013, Joyce understood that she had signed a statement "under duress" in February, 2013, agreeing to have no "direct" contact with Carpenter and to not "harass" him.  She complied to the best of her ability, but the situation became  increasingly  stressful because she was ordered to continue to be Carpenter's  PGL and Carpenter continued to have his work area six feet away from her.

29. Joyce now had been disciplined three times, even though she had not had "direct contact" with Carpenter, and had, for violations 2 & 3, reported her needs to her supervisor, as directed. At this juncture Joyce believed she was doing as she was instructed and she was 'between a rock and a hard place."

30.   The company disciplined Joyce for behaviors which she believed at all relevant times related to her duties as band saw, stone saw, thread roller operator and

7

PGL. Neither the company nor the union would help her to know what constituted unacceptable behavior on her part, at the same time as they changed their position on "acceptable" behavior, like going to her supervisor when she had problems with Carpenter's work. On the other hand, Carpenter was never disciplined for "indirect" contact, such as his repeated walking away from his band saw running, with it still running. The more outrageously Carpenter behaved, the more Joyce, who had ten years' seniority and a perfect work record, was punished.

31. Joyce filed her first complaint of sex discrimination with the State of Wisconsin Equal rights division/EEOC on November 7, 2013. She asked that the "sex discrimination complaint" which management told her Carpenter had filed against her be thrown out, for back pay and that Carpenter be transferred to a different department. At the time of filing her complaint, neither the company nor the union had let Joyce know what the Carpenter "harassment complaint" was all about, despite her requests to know, because of their constant innuendo that she was "harassing" Carpenter.

32. On December 13, 2013, Joyce was disciplined a fourth time. Company plant manager Jim Kaplinski ("Kaplinski") wrote in his disciplinary report that another employee, Jeff Pollnow, came to him and said that Joyce felt she was "between a rock and a hard place." Kaplinski also said "it was the perception of Jeff and you that John was not being productive that day."

33. As Joyce was still, against her wishes, Carpenter's PGL, it was her job to, inter alia, "…work with the process groups to schedule/plan activities required to meet customer demand." Her job description required her to "assist in good material flow

8

within process groups," yet she was disciplined for doing that where Carpenter was concerned. Joyce's efforts to get the company to help her in this impossible situation were at all times used against her.

34. The discipline against Joyce for Pollnow's going to Kaplinski was dated December 19, 2013. It said: "YOU ARE TO HAVE NO DIRECT OR INDIRECT CONTACT OR COMMUNICATION WHATSOEVER WITH EACH OTHER AS LONG AS YOU ARE EMPLOYED BY MILWAUKEE CYLINDER.ALL QUESTIONS ARE TO BE ADDRESSED TO YOU SUPERVISOR."

35. In the first place, Joyce had already been disciplined twice for addressing questions to her supervisor. In the second place, Joyce had never received such a directive as indicated in paragraph 27, *supra., prior to December 19, 2013.* Third, even in December, 2013, neither the company nor the union ever told Joyce what this new directive, of "no direct or indirect" contact with Carpenter could possibly mean, given her job, his proximity to her and her PGL duties.

36. Until December, 2013, after she had filed with EEOC, the only written "directives" Joyce was aware of were two. The first was a February, 2013, writing that both Joyce and Carpenter were to have no "direct" contact with each other. Joyce understood this to mean: she never talked to him directly.

37. The second written "order" occurred on July 30, 2013. That order came from the company to her as part of her one day suspension for turning off Carpenter's radio during break. It said: "…you do not abide by the agreement (approved by management

9

within process groups," yet she was disciplined for doing that where Carpenter was concerned. Joyce's efforts to get the company to help her in this impossible situation were at all times used against her.

34. The discipline against Joyce for Pollnow's going to Kaplinski was dated December 19, 2013. It said: "YOU ARE TO HAVE NO DIRECT OR INDIRECT CONTACT OR COMMUNICATION WHATSOEVER WITH EACH OTHER AS LONG AS YOU ARE EMPLOYED BY MILWAUKEE CYLINDER.ALL QUESTIONS ARE TO BE ADDRESSED TO YOU SUPERVISOR."

35. In the first place, Joyce had already been disciplined twice for addressing questions to her supervisor. In the second place, Joyce had never received such a directive as indicated in paragraph 27, *supra., prior to December 19, 2013.* Third, even in December, 2013, neither the company nor the union ever told Joyce what this new directive, of "no direct or indirect" contact with Carpenter could possibly mean, given her job, his proximity to her and her PGL duties.

36. Until December, 2013, after she had filed with EEOC, the only written "directives" Joyce was aware of were two. The first was a February, 2013, writing that both Joyce and Carpenter were to have no "direct" contact with each other. Joyce understood this to mean: she never talked to him directly.

37. The second written "order" occurred on July 30, 2013. That order came from the company to her as part of her one day suspension for turning off Carpenter's radio during break. It said: "…you do not abide by the agreement (approved by management

9

Case 2:18-cv-01790   Filed 11/12/18   Page 9 of 19   Document 1

within process groups," yet she was disciplined for doing that where Carpenter was concerned. Joyce's efforts to get the company to help her in this impossible situation were at all times used against her.

34. The discipline against Joyce for Pollnow's going to Kaplinski was dated December 19, 2013. It said: "YOU ARE TO HAVE NO DIRECT OR INDIRECT CONTACT OR COMMUNICATION WHATSOEVER WITH EACH OTHER AS LONG AS YOU ARE EMPLOYED BY MILWAUKEE CYLINDER.ALL QUESTIONS ARE TO BE ADDRESSED TO YOU SUPERVISOR."

35. In the first place, Joyce had already been disciplined twice for addressing questions to her supervisor. In the second place, Joyce had never received such a directive as indicated in paragraph 27, *supra., prior to December 19, 2013.* Third, even in December, 2013, neither the company nor the union ever told Joyce what this new directive, of "no direct or indirect" contact with Carpenter could possibly mean, given her job, his proximity to her and her PGL duties.

36. Until December, 2013, after she had filed with EEOC, the only written "directives" Joyce was aware of were two. The first was a February, 2013, writing that both Joyce and Carpenter were to have no "direct" contact with each other. Joyce understood this to mean: she never talked to him directly.

37. The second written "order" occurred on July 30, 2013. That order came from the company to her as part of her one day suspension for turning off Carpenter's radio during break. It said: "…you do not abide by the agreement (approved by management

and the union) that you will not have **person-to-person oral conversation with John Carpenter in the workplace**…"

38. Joyce grieved this first ever suspension of July 29, 2013 because she had not had "direct" contact with Carpenter; she had turned off his radio which he had left on (arguably to harass her) during a break when radios were supposed to be turned off, and, he was not at his work station when she turned it off. This *post hoc* directive had punished her for behavior which she did not commit. Neither the company nor the union cared about her position, and would not talk to her. Her grievances were all summarily denied.

39. When, in September, 2013, the words "no *indirect* contact" showed up in writings from the company, Joyce at first didn't notice the shift of language, and then, when she had to sign a document with these words, in December 2013, she had no idea what that meant and no one in the company or the union would tell her.

40. The "indirect" directive in the written order of December 19, 2013 was the first one that Joyce was given and required to sign, along with management from the company and union heads. This order was the first she learned that her violations were "serious" and could get her fired. It was the first time in her 25 years of employment that she was now subjected to "progressive discipline."

41. Joyce became increasingly stressed. She could not get Kaplinski to talk to her. From the beginning of her PGL appointment, at meetings, which he directed, he never talked to her and never responded to her greetings, leaving her as the only woman present, feeling demeaned, as he joked around with the other PGLs, all men.

Joyce was repeatedly ignored by Kaplinski and couldn't get any help from her supervisor Dove, either, nor from the union, as to what might "indirect" mean.

42. Further, Joyce had already been disciplined for going to Dove, as directed. She felt stress and anxiety over the apparent effort by the company to set her up so that she would be fired, no matter what she did or how hard she tried to follow their shifting rules. As of the end of December, 2013, Joyce had been disciplined four times and in December, 2013 she learned for the first time that one more "violation" would get her terminated.

43. One of the things Carpenter "accused" Joyce of was "harassment" for turning off his band saw when he walked away from it while it was running. Although this was dangerous, prohibited, unsafe behavior, for which anyone else working at the company would be disciplined, Joyce was criticized for turning off the running band saw. On the other hand, Carpenter's "accusation" of "harassment" for doing just that was used against Joyce and Carpenter was never disciplined for walking away from his band saw while it was running.

44. On December 19, 2013, the company and the Union introduced, for the first time, a written document to Joyce for her signature that stated, "YOU ARE TO HAVE NO DIRECT OR INDIRECT CONTACT OR COMMUNICATION WHATSOEVER WITH EACH OTHER AS LONG AS YOU ARE EMPLOYED BY MILWAUKEE CYLINDER. ALL QUESTIONS ARE TO BE ADDRESSED TO YOU SUPERVISOR."

45. Retaliation against Joyce began after Joyce filed her first complaint of discrimination against the company on November 7, 2013. After she filed there was no

11

EEO officer assigned by the company or the union to talk to her or work with her or counsel her about her complaints of sex discrimination. There was no EEO officer, nor any women in management, who came to her assistance. The only people in charge were the very men that were disciplining her.

46. Management of the company continued to ramp up adverse actions against her for alleged infractions that no one else in the company, almost all men, had ever been disciplined for. And Carpenter was allowed to continue to harass her and maintain unsafe practices, without consequence.

47. In Joyce's entire 25 years at the company there had been only five women hired in the shop. There had never been a company-wide nor union-wide workshop for workers regarding what constitutes sex discrimination, harassment nor hostile work environment.

48. After being disciplined several times for these unintentional alleged violations, Joyce sought medical treatment for stress and anxiety caused by her hostile work situation.

49. Joyce was terminated in May, 2014. Among the reasons given for her termination - in a meeting in April, 2014 with management and PGLs to discuss training matters, Joyce asked management and other PGLs to consider training Carpenter on the Thread Roller. Dove asked each PGL if they would train him. No one agreed to do so. Joyce considered her request to be timely and appropriate. She was terminated for this. The letter of termination said: "You attended the meeting in your role as Process

12

Group Leader. John Carpenter did not attend, but as you well know, comments such as the one you made are often relayed to John."

50. The company knew, or should have known that the unsigned document dated "July 25, 2013" ("false document") was never given to Joyce and never signed by her. Instead, it was submitted with the company's ERD reply in 2014 in order to create the appearance of legitimate "progressive discipline."

51. The company knew or should have known that without that false document all disciplines were invalid up until December 19, 2013, and that Joyce was denied fair notice and a fair process.

52. The company continuously questioned Joyce's memory of events, trivialized her thoughts and feelings, gave no regard to her thoughtful, detailed grievances and turned around everything to blame her, in order to favor Carpenter and punish her. The company knew or should have known, that this was a pattern of emotional abuse, called *gaslighting,* which they engaged in because of her female gender, and in retaliation for her calling out this behavior as sex discrimination and for engaging in the protected activity of: opposing this illegal behavior by complaining to going to the company and union, and filing her complaints.

DISCRIMINATION BY THE UNION

53. Plaintiff realleges and incorporates by reference herein paragraphs 1-52.

54. At all material times, the union cooperated with management in allowing Joyce to be charged with offenses for which she was never given notice, and which, to any reasonable person, were patently unfair.

55. The union never assisted Joyce when she was disciplined for turning off Carpenter's radio, even though they knew that quiet during breaks was an unwritten rule and that Joyce had not had "direct" contact with Carpenter.

56. The union knew or should have known that this first discipline could just as well have been leveled against Carpenter for harassing Joyce for leaving his radio "blaring" during quiet breaks.

57. The union knew or should have known that they were not following a fair progressive discipline process because if Joyce was disciplined for "indirect" contact, she had had no notice of that nor an explanation of what "indirect contact" might mean.

58. In response to Joyce's first complaint against the company, the company provided ERD, in August 2014, in response, with a document that they claimed had been given to Joyce on July 25, 2013 ("notice and order"). This document was unsigned and looked something like the December, 2013 document that for the first time put Joyce on notice of progressive discipline, for which she was receiving a "fourth" discipline.

59. Joyce had never seen the July 25, 2013 **false notice** and order until she got the company's response to her discrimination complaint to the Equal Rights Division in August, 2014.

60. The union knew or should have known that none of the union leaders had given this document to Joyce. Yet, they cooperated with the company by allowing that document to be used by the company against Joyce, who claimed that it was "proof" of

a "no 'indirect' contact" order, and which could then allow her to be disciplined for anything they considered "indirect" contact with Carpenter.

61. The union knew or should have known that the company was framing, or *gaslighting* Joyce with this document. When she grieved all her disciplines up to the December 13, 2013 signed document that the union should have cried "foul" to management and should have helped her prevail.

62. The union knew or should have known that Joyce was being treated differently than Carpenter (or any other male in the shop) because of her gender, female.

63. No one in the union ever signed the July 25, 2013 Notice and Order; no one in the union ever claimed to have given it to her; and, on information and belief, no one in the union knew of its existence before management supplied it to ERD in August 2014.

64. In all these respects, the union colluded or conspired with management to have Joyce be disciplined frivolously, without any true concern for her long years as a great employee and someone who was just trying to do her job.

65. The union knew or should have known that it was Joyce who was being harassed by Carpenter, and that it would be a male union member who stood to get her job when she was fired. Their lack of equal and fair representation was because of her gender, female, and not because she had violated a "direct order."

66. The union knew or should have known about Carpenter's unsafe behavior at his band saw, which was just six feet away from Joyce's work station. This is unsafe for

ANY worker in the shop, yet, Carpenter complained in his "harassment" complaint that Joyce had pressed the safety stop on his band saw-and it constituted harassment. Carpenter admitted walking away and leaving his machine running, but claimed it was safe.

67. The union knew or should have known that Joyce had been injured on July 25, 2013 by Carpenter's unsafe behavior, when poorly stacked tubing fell on her. Joyce was under medical care for her injuries until the day she was fired.

68. The union knew or should have known that Joyce should not have been disciplined for going to her supervisor, Tim Dove, AS DIRECTED, when she needed work done by Carpenter. Instead, the union rubber stamped her unfair disciplines and denial of her grievances, and never went to bat for her for one reason: her gender: female.

69. Joyce was fired for, *inter alia,* trying to get help with her job in a private meeting with management and PGLs. The union knew or should have known that Joyce had a right to privacy and to express her needs in this group. Instead, it backed management, who said they fired her for *mentioning Carpenter's name and she should have known some of the guys would tell him.*

70. The union knew or should have known that these set-up disciplines were unreasonable to any reasonable person and that the reason she got these disciplines was because of her gender: female.

### Title VII of Civil Rights Act of 1964 – Sex Discrimination

71. Plaintiff realleges and incorporates by reference herein paragraphs 1- 70.

72. Defendants' actions in discriminating against Plaintiff on the basis of sex in the manner described above were in violation of Plaintiff's rights secured by Title VII of the Civil Rights Act of 1964, as amended.

73. Defendants' conduct as described above was solely based on the Plaintiff's sex.

74. As a direct and proximate result of Defendants' discrimination on the basis of sex, Plaintiff has suffered damages including economic loss and personal injuries, including but not limited to pain and suffering and psychological harm.

### Title VII of Civil Rights Act of 1964 – Retaliation

75. Plaintiff realleges and incorporates by reference herein paragraphs 1 – 70.

76. Defendant company's actions in retaliating against Plaintiff on the basis of her having complained to and against the Defendants about their sex discrimination, all in the manner described above, were in violation of Plaintiff's rights secured by Title VII of the Civil Rights Act of 1964, as amended.

77. As a direct and proximate result of Defendant company's retaliation against Plaintiff for having complained to and against the Defendants about their sex discrimination, Plaintiff has suffered damages including economic loss and personal injuries, including but not limited to pain and suffering and psychological harm.

WHEREFORE, Plaintiff respectfully requests that this Court:

(1) Issue a declaratory judgment that Defendants' actions and conduct in this matter violated Title VII;

(2) Enjoin Defendants and their officers, agents and employees from engaging in labor policies or practices that discriminate against Plaintiff on the basis of sex and retaliation;

(3) Order Defendants to make Plaintiff whole, including but not limited to payment of back wages, payments into the health and benefit funds and other pecuniary loss, and by providing for reinstatement;

(4) Award Plaintiff compensatory damages in an amount to be determined at trial;

(5) Award punitive damages in an amount to be determined at trial;

(6) Award Plaintiff her costs and any reasonable attorney's fees in this action; and

(7) Grant such additional relief as the Court deems proper and just.

**PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY**

Dated this 12th day of November, 2018

HORIZONS LAW GROUP, LLC

Electronically signed by:
/s/Larraine McNamara-McGraw
Larraine McNamara-McGraw
State Bar No. 1003970
611 N. Barker Road, Suite 209
Brookfield, WI 53045
(414) 899-0883
*Email: Lmcgraw@horizonslaw.com*

Electronically signed by:
/s/Lilah J. Zajac
Lilah J. Zajac
State Bar No. 1038417
611 N. Barker Road, Suite 209
Brookfield, WI 53045
262-432-3600
*Email: lzajac@horizonslaw.com*