EXHIBIT
32

Department of Workforce Development
Equal Rights Division
**HEARING & MEDIATION SECTION**
819 N 6th St Rm 723
Milwaukee WI  53203-1687
Telephone:   (414) 227-4385
FAX:            (414) 227-4981
TTY:            (414) 227-4081
(TTY-Hearing Impaired Callers)

**STATE OF WISCONSIN**

**DWD**
Department of Workforce Development

**Scott Walker,** Governor
**Raymond Allen,** Secretary

# CERTIFICATION

I, Juanita Evans, Legal Secretary for the Hearing & Mediation Section of the Equal Rights Division, hereby certify that the attached copy of the decision in the matter of **Susan Joyce v. Milwaukee Cylinder, ERD #CR201303179 & #CR201402554, EEOC #26G201400188C & #26G201401240C** issued on September 29, 2017 is an exact copy of the original decision on file with the Equal Rights Division.

Juanita Evans
Hearing & Mediation Section
Equal Rights Division

ERD-7087-MLD-E (R. 01/16)

Department of Workforce Development
Equal Rights Division
**HEARING & MEDIATION SECTION**
819 N 6th St Rm 723
Milwaukee WI 53203-1687
Telephone: (414) 227-4385
FAX: (414) 227-4981
TTY: (414) 227-4081
(TTY-Hearing Impaired Callers)



**STATE OF WISCONSIN**

**DWD**
Department of Workforce Development

**Scott Walker,** Governor
**Raymond Allen,** Secretary

SUSAN M JOYCE
3465 S KANSAS AVE
MILWAUKEE WI 53207
    Complainant

    vs.

MILWAUKEE CYLINDER
5877 S PENNSYLVANIA AVE
CUDAHY WI 53110
    Respondent

**NOTICE OF APPEAL RIGHTS**

**REVIEW BY THE LABOR AND
INDUSTRY REVIEW COMMISSION**

Re:     ERD Case No. CR201303179 & CR201402554
        EEOC Case No. 26G201400188C & 26G201401240C

The attached decision is a final decision. Any party who is dissatisfied with the attached Decision and Order of the Administrative Law Judge (or with earlier non-final decisions which could not be appealed until a final order was entered) may file a written petition for review by the Labor and Industry Review Commission.

The Petition for Review must be <u>received</u> by the Equal Rights Division within twenty-one (21) days from the date of the decision, or the decision will become final.

The Petition for Review should be mailed, faxed or brought to the Equal Rights Division at one of these addresses:

Equal Rights Division
Hearing & Mediation Section
819 North Sixth Street, Rm. 723
Milwaukee, Wisconsin 53203
FAX: (414) 227-4981

Equal Rights Division
Hearing & Mediation Section
201 East Washington Ave., Rm. A300
P.O. Box 8928
Madison, Wisconsin 53708
FAX: (608) 267-4592

Petitions filed by facsimile transmission shall be considered filed on the next business day if they are received after 4:30 pm or on a day when the offices are closed. (Sec. DWD 218.25(1)(b), Wis. Adm. Code.)

A copy of the Petition for Review should be mailed to each of the other parties.

Dated and Mailed: September 29, 2017

cc:     Complainant
        Respondent
        LARRAINE MCNAMARA MCGRAW, Attorney for Complainant
        DAVID J HANUS, Attorney for Respondent

Attachment

ERD-7087-MLD-E (R. 01/16)

Susan Joyce
3465 South Kansas Avenue
Milwaukee, Wisconsin 53207
      Complainant

      vs.

**DECISION and**
**MEMORANDUM OPINION**
ERD Case No. CR201303179
EEOC Case No. 26G201400188C
&
ERD Case No. CR201402554
EEOC Case No. 26G201401240C

Milwaukee Cylinder
5877 South Pennsylvania Avenue
Cudahy, Wisconsin 53110
      Respondent

## PROCEDURAL BACKGROUND

This decision involves two complaints that the Complainant, Susan Joyce, filed with the Equal Rights Division ("ERD") against the Respondent, Milwaukee Cylinder ("the Company").

In the first complaint (ERD No. CR201303179), which was filed on November 7, 2013, the Complainant alleged that Milwaukee Cylinder discriminated against her on the basis of sex with regard to the terms and conditions of her employment, in violation of the Wisconsin Fair Employment Act ("WFEA"), Wis. Stat. §§ 111.31-111.395.

In her second complaint (ERD No. CR201402554), which was filed on August 14, 2014, the Complainant alleged that the Respondent discriminated against her on the basis of sex, and retaliated against her for having filed her first complaint, with regard to the termination of her employment, in violation of the WFEA.

In addition to her two complaints against the Company, the Complainant filed a third complaint (ERD No. CR201403422) on October 24, 2014 against the International Association of Machinists, Local 1862 ("the Union"), which represents employees at

Milwaukee Cylinder. In that complaint, which was filed on October 24, 2014, the Complainant alleged that the Union discriminated against her on the basis of sex with regard to its representation of her as a member of the Union in violation of the WFEA.

On March 16, 2015, an ERD investigator issued Initial Determinations in all three of the Complainant's cases. In her two cases against the Company, the investigator found "probable cause" to believe that the Company had discriminated against her on the basis of sex with regard to the terms and conditions of her employment; 2) that the Company had discriminated against her on the basis of sex with regard to her termination; and that the Company had retaliated against her for filing her first complaint with regard to her termination. In her case against the Union, the investigator found "probable cause" to believe that the Union had discriminated against her on the basis of sex with regard to its representation of her as a member of the Union, as alleged in the complaint.

Based on the initial findings of probable causes, all three of the Complainant's cases were certified to a hearing on the merits.

For reasons of judicial and administrative economy, the parties stipulated to having the three cases consolidated for purposes of hearing, as the hearings in all three cases were likely to involve the presentation of much of the same evidence. In addition, the parties stipulated to bifurcate the hearing as to liability and remedy. Accordingly, it was agreed that the first phase of the hearing would only address issues related to liability; a second phase would be held later to address issues related to remedy, such as back pay and reinstatement, but only if liability was found during the first phase.

A consolidated hearing on the Complainant's three cases (on liability only) was held in the Milwaukee State Office Building before the undersigned Administrative Law Judge ("ALJ"). The six-day hearing was held on the following dates: March 1, March 2, March 3, July 6, July 7, and July 8, 2016. The Complainant was represented at hearing by Attorneys Larraine McNamara-McGraw and Lilah Zajac of Horizons Law Group, LLC. The Company was represented at hearing by Attorneys David J. Hanus and Elizabeth Odian of Hinshaw & Culbertson, LLP. The Union was represented at hearing by Attorney Matthew R. Robbins of the Previant Law Firm, SC.

Following the hearing, transcripts of all six days of hearing were prepared and filed.[1] The parties subsequently submitted post-hearing briefs, and the record in this matter closed on December 30, 2016 with the receipt of the last post-hearing submission.

**This decision makes findings only with regard to the Complainant's two cases against Milwaukee Cylinder in ERD Nos. CR201303179 and CR201403422).**

---

[1] References to the transcript, which contains six continuously-paginated volumes, will be designated herein as Tr. at p. __. References to exhibits will reflect the marking system used at hearing, with Milwaukee Cylinder's exhibits marked at MC-1, MC-2, etc.; Complainant's exhibits marked as C-1, C-2, etc.; and Union exhibits marked as U-1, U-2, etc.

A separate decision is being issued today with regard to her case against the Union in ERD No. CR201403422.

Based on the evidence received at hearing, the Administrative Law Judge now makes the following:

## FINDINGS OF FACT

*[General background]*

1. The Respondent, **Milwaukee Cylinder**[2] ("the Company") manufactures cylinders of various types, including hydraulic, pneumatic, and construction cylinders. The Company operates out of a facility located in Cudahy, Wisconsin.

2. A holding company known as **Actuant Corporation** is Milwaukee Cylinder's parent company. **Enerpac** is one of Actuant's business divisions. Milwaukee Cylinder is part of the Enerpac division.

3. At all relevant times, **James Kaplinski**, held the position of Operations Leader at Milwaukee Cylinder. In that position, Kaplinski was responsible for overseeing manufacturing operations at the Company's Cudahy plant.

4. At all relevant times, **Donald Ritt** held the position of Human Relations ("HR") Leader at Enerpac. In that position, Ritt was responsible for overseeing HR matters at a number of Enerpac sites, including Milwaukee Cylinder. Ritt is now retired, but during the period relevant to this case, his office was located at an Enerpac facility in Menomonee Falls, Wisconsin.

5. At all relevant times, the Respondent, the **International Association of Machinists and Aerospace Workers ("IAM"** or "the Union"), and its local affiliate, **Local 1862** ("the local") represented production employees at Milwaukee Cylinder. At all relevant times, the Union and the Company were parties to a collective bargaining agreement ("Union Contract").

6. For operational purposes, the Union is divided into a number of geographical districts, one of which is **District No. 10**, which has jurisdiction over an area covering most of Wisconsin. During the relevant time period, Local 1862 was one of 23 locals affiliated with District No. 10.

7. At all relevant times, **Scott Parr** was employed by District 10 as Assistant Director and Business Representative. Parr worked out of a District 10 office located in Milwaukee, Wisconsin.

8. At any given time during the relevant period, a number of the employees at Milwaukee Cylinder held positions as Union representatives (also referred to a as

---

[2] For ease of reference, the first time an entity or individual is identified, the name appears in boldface.

"stewards") for Local 1862. Some of the employees who served as representatives for the local during the period of time relevant to this case included **Ted Ellefson**, **Robert Monte**, and **Jac Remus**.

*[The Complainant]*

9.  The Complainant, **Susan Joyce**, a female, was employed by Milwaukee Cylinder from October 3, 1988 to May 2, 2014. Throughout her employment at Milwaukee Cylinder, Joyce was a member of IAW Local 1862 and was covered under the Union Contract.

10. During her employment at Milwaukee Cylinder, Joyce was one of only a handful of female production or "shop" employees. During the last few years of her employment, she was one of only four women, out of a total of 69 or 70 employees, who worked in the shop.

*[Process Group Leaders]*

11. At Milwaukee Cylinder, the shop floor is divided into small work groups or "cells." The production employees who work in each cell are supervised by a "Cell Leader."

12. At all relevant times, **Tim Dove** was the Cell Leader responsible for supervising all of the work groups on the shop floor.

13. At all relevant times, Joyce worked on first shift as a machine operator in the "Tubes and Tie Rods" group, where she was assigned to be the primary operator of the thread roller machine. The other machines in the Tubes and Tie group during Joyce's employment were the small band saw and the leadwell lathe.

14. In each work group, the Company selects one employee to serve as the Process Group Leader ("PGL") for that group. The PGL's continue to perform their regular duties, but they are also required to perform some additional duties, for which they get additional compensation.

15. PGL's are considered lead workers who are responsible for facilitating production within their assigned work group, which includes such duties as scheduling and prioritizing the daily workload; going to daily production meeting with other PGL's; updating other groups on the status of work in their own group; general troubleshooting; and assisting with the training of other employees.

16. PGL's do not have any supervisory authority with respect to the other employees in their group. Accordingly, PGL's are not involved in making disciplinary decisions regarding the other employees, nor are they responsible for monitoring their attendance or productivity, which are responsibilities of the Cell Leader.

4

17.   In 2008, Joyce was selected as the PGL for the Tubes and Tie Rods area.  At the time of her appointment, she was the first woman at Milwaukee Cylinder to serve as a PGL.   As a PGL, Carpenter received an add-on to the hourly pay rate that she received as a machine operator

*[John Carpenter]*

18.   In 1988, a man named **John Carpenter** was hired by Milwaukee Cylinder as a production employee.

19.   At all relevant times, Carpenter worked on first shift in the Tube and Tie Rods area as the primary operator of the small band saw, usually referred to simply as the "band saw."  As the band saw operator, Carpenter worked in close proximity to Joyce, whose thread roller machine was located only a few feet away.

20.   During his employment, Carpenter was diagnosed with a mental health condition known as bipolar disorder. On many occasions throughout his employment at Milwaukee Cylinder, Carpenter took medical leave under the Family & Medical Leave Act ("FMLA") in connection with his bipolar condition.

21.   In approximately 1999, Carpenter and Joyce became romantically involved.  In 2000, Carpenter moved into Joyce's home, and they lived together for the next 10 years.  Sometime in 2010, their personal relationship ended, and Carpenter moved out of Joyce's home.

22.   After their personal relationship ended, Carpenter and Joyce continued to work in close proximity to each other at work, operating their respective machines a few feet apart in the Tubes and Tie Rods are on first shift.  Because Joyce was the PGL for the group, she frequently interacted with Carpenter in carrying out her PGL responsibilities for her work group.

23.   For a brief period after their break-up, Joyce and Carpenter were able to get along reasonably well in the workplace. However, as the months went by, they increasingly had difficulties getting along, and they began to argue and bicker with one another in the workplace, often within the earshot of their co-workers.

24.   As time went on following their break-up, Joyce became increasingly frustrated with Carpenter's relatively frequent absences from work. Joyce knew quite a bit about the nature of Carpenter's mental health issues, from having lived with him for ten years and having accompanied him to many of his doctor visits, and knew that many of his absences were related to his illness.   Nonetheless, she increasingly came to resent his absenteeism.  One reason was because when he was absent, she often had to fill in for him on the band saw (as did other employees), in addition to still having to operate her own machine.

25.  By late 2012 and early 2013, Joyce and Carpenter were increasingly having problems getting along in the workplace. Joyce and Carpenter frequently complained about each other to their co-workers, to their Union representatives, and to their supervisor, Tim Dove. For example, Joyce complained to Dove a number of times about Carpenter yelling and swearing at her in the shop in from of other employees; Carpenter also complained to Dove about the way that Joyce treated *him*, alleging that she spoke to him in a demeaning way and was hypercritical of his work.

26.  Also, by early 2013, a number of co-workers began to complain to management about having to contend with Joyce and Carpenter's unpleasant conduct toward each other in the plant, which many some of them found distracting. Also, some employees complained about being asked to take sides in the ongoing feud between Joyce and Carpenter.

27.  For example, **John Dallas**, an employee worked in close proximity to both Joyce and Carpenter complained to James Kaplinski on more than one occasion that they were "at it again," referring to their verbal sparring. Dallas told Kaplinski that although he was friends with both Joyce and Carpenter, they were "driving him insane" with their "bickering" and "fighting back and forth." Dallas also told Kaplinski that he found the situation very distracting and disruptive to getting his work done.[3]

28.  On or around February 19, 2013, Joyce complained to Dove that once again Carpenter was yelling and swearing at her in the workplace and she wanted it to stop.

29.  On February 20, 2013, Dove called a meeting with both Joyce and Carpenter. He told them that he was fed up with their hostile conduct towards each other in the workplace and that he wanted them to stay away from each other as much as possible.

30.  On February 21, 2013, Dove met with Joyce and Carpenter again. This time he told them that he wanted them to enter into an agreement to stop "harassing" one another and to avoid communicating with one another as much as possible. Joyce questioned Dove as to how she could perform her duties as a PGL without communicating with Carpenter, since he was one of the machine operators in her area. Dove told her that any time she needed to communicate with Carpenter about a work-related matter, she should talk to him about it, and he would convey that information to Carpenter as needed.

---

[3] See Tr. at p. 974.

31.    At the end of the meeting, Carpenter and Joyce both agreed that they would refrain from any "harassment" of the other and to avoid any contact with one another. However, it is unclear from the evidentiary record whether they actually signed a written agreement to that effect or whether they only entered into an oral agreement.[4]

*[Carpenter files internal harassment complaint]*

32.    After entering into a "non-harassment" agreement in February of 2013, Joyce and Carpenter continued to have conflicts in the workplace.

33.    In early May of 2013, Carpenter complained to Jim Malison and/or Tim Dove that he felt that Joyce was still "harassing" him and that he wanted it to stop. Carpenter was told to put his complaint in writing.

34.    On May 7, 2013, Carpenter wrote up a one-page handwritten complaint about Joyce.  In his complaint, he stated the following:

> *Sue Joyce and I have had a ten year relationship. We broke up two to three years ago. That's when the harassment started.  She would write me threatening notes [and would] [p]age me over the [public address system] at work to embarrass me in front of other co-workers.  She would make up safety violations to try to have me discipline[d].  She would go to supervisor[s] stating production issues that didn't exist. She used her position as a Group leader to control my overtime and hurt me monetarily.  In the last week she has make up shop rules about talking too loud to have me disciplined by Tim Dove.  After she was told that this was no violation of any shop rules she then called **Larry Yates** [the safety manager] and [tried] to have me disciplined for a safety violation.  She told Larry that I would walk away from my work center and leave my machine running to go to the bathroom.  This is not true.  She speaks to me in a demeaning manner all the time.  I have not talk[ed] to her or responded to her at all. I just walk out of my work area and call Tim [Dove]. I believe that [if] this is not [stopped] right now this will escalate on her part.  All I'm asking for is [for] this to stop.*

35.    Carpenter handed in his statement to Dove or Malison, who passed it on to Kaplinski, the Operations Leader.

36.    On May 8, 2017, Kaplinski sent an email to Donald Ritt, the HR Manager at Enerpac, with a copy of Carpenter's complaint attached. As noted earlier, Ritt was responsible for HR matters at Milwaukee Cylinder. In his cover email, Kaplinski stated the following:

---

[4] Neither party ever produced a copy of a written agreement, but some of the documents in the record refer to a written agreement that Joyce and Carpenter signed in February agreeing to leave each other alone.  It should also be noted that Joyce initially testified that it was just an oral agreement, but she later changed her testimony and claimed that it was in writing.  Unfortunately, Tim Dove, who may have recalled whether the agreement was in writing and what it said, did not testify at the hearing.  By the time of the hearing, Dove was no longer employed at Milwaukee Cylinder.

I [have attached] this letter from John Carpenter claiming that Sue Joyce is harassing him. Both employees were told to stay away and have no contact with each other. The union is aware of the situation. How do you want to move forward?

37. On or about May 15, 2013, Ritt and Kaplinski had a conversation about the issues that Carpenter had raised in his complaint, and Kaplinski provided Kaplinski with some background about the ongoing situation between Carpenter and Joyce. Ritt was told that a sometime before Carpenter filed his complaint, he and Joyce had "signed a mutual agreement to stop fighting." Ritt also learned that management had spoken to the Union at least once about the possibility of assigning either Carpenter or Joyce to another job, in order to separate them. However, Ritt was told that neither employee was willing to voluntarily move to another position, which would probably involve a pay cut, or to move second shift. There was also a discussion as to whether both employees should be disciplined for their conduct.

38. After getting some background on the situation, Ritt told Kaplinski that he would conduct an investigation into the issues raised by Carpenter's complaint. He indicated that he planned to meet with both Carpenter and Joyce to hear both sides of the story. Ritt also indicated that he would determine whether any type of disciplinary action was warranted for either or both of them.

39. As will be detailed later in this decision, Ritt did not meet with Carpenter and Joyce until July of 2013. In the meantime, throughout the rest of May, and into June, Dove informed Kaplinski on a number of occasions that Carpenter and Joyce were continuing to have problems getting along in the workplace.

40. Sometime in June of 2013, Kaplinski contacted Scott Parr, the business agent for District 10, to discuss the problems that Joyce and Carpenter were having in the workplace. Kaplinski asked Parr if he thought he could do something to help defuse the situation between Carpenter and Joyce. Kaplinski told Parr that back in February of 2013, Joyce and Carpenter's supervisor (Tim Dove) had met with them and had asked them to agree to stop bothering each other. However, according to Kaplinski, the two of them were still having problems getting along, and he told him that Carpenter had recently filed a complaint with the Company alleging that Joyce was continuing to harass him in the workplace. Parr agreed to come to the Milwaukee Cylinder plant to meet with Carpenter and Joyce.

41. When Kaplinski contacted him, Parr had already heard about the Carpenter/Joyce situation from some of the Union representatives who worked at Milwaukee Cylinder. Among other things, he learned that Carpenter and Joyce had lived together for a number of years, but, since their break-up a few years earlier, they had trouble getting along as co-workers. Parr became concerned as soon as heard about their situation. Based on his experience dealing with employees in a variety of workplaces, he knew that co-workers who continued to work together after the end of a romantic relationship often brought their personal disagreements into the workplace and that as a result, they often ended up being

disciplined or even terminated. Parr hoped that he could keep that from happening in the case of Carpenter and Joyce.

42. Sometime in late June of 2013, Parr went to Milwaukee Cylinder to talk to Carpenter and Joyce on behalf of the Union. He spoke to each of them separately, advising them to stay away from each other as much as possible.

43. When Parr spoke to Joyce, she indicated the frustration that she felt working with Carpenter in the same work group. Among other things she mentioned his ongoing absenteeism; she also told him that she felt that Carpenter was not very productive on his band saw machine, which she claimed made it difficult for her as the PGL of the Tubes and Tie Rods group. Parr advised Joyce not to worry about Carpenter's absenteeism or productivity, as she was not his supervisor, and he advised her to just focus on her own job as a thread roller.

44. At some point in May or June, Joyce learned from both the Company and the Union that Carpenter had filed some type of "sexual harassment" complaint against her. Joyce asked the Company to provide her with a copy of the complaint, but it refused to provide it. She also asked the Union if could get a copy of the complaint for, but it told her that it was unable to do so.

*[Ritt meets with Joyce]*

45. On July 11, 2013, Ritt went to the Milwaukee Cylinder facility to meet with Joyce. Dove was also present during the meeting. At the outset of the meeting, Ritt gave Joyce the opportunity to have a Union representative present, but she declined.

46. Ritt told Joyce that was there to investigate a harassment complaint that Carpenter had filed against her with the Company. Joyce asked if she could see the complaint, but Ritt said he would not provide her with a copy at that time. Ritt told her that he also planned to interview Carpenter, but because Carpenter happened to be absent that day, he would interview her first. Ritt also told Joyce that in conducting his investigation, he was not trying to "assign guilt" to either her or Carpenter. Rather, he told her, he was looking for a solution that would allow them to work together without either of them having to be disciplined or reassigned.

47. According to his notes of their meeting,[5] Joyce began their conversation by talking about Carpenter's bi-polar disorder and how disruptive it was for her work team. Ritt paraphrased her comments as follows:

> *Well, I don't know if it is legal to say this or not but he is bipolar. He can show manic behavior in the morning and depressed behavior in the afternoon. It is very disruptive to our team. You can ask any one of them … When John is gone, they say how nice it is to not have to deal with their behavior.*

---

[5] See Exh. MC-26, which contains Ritt's notes of his meeting with Joyce.

48. As they talked, Joyce continued to stress how much she was bothered by Carpenter's absenteeism, and she claimed that he was only at work 50% of the time. She also claimed that she and the others on the team had to work hard to "cover" for him and were "tired" of having to "work harder" due to Carpenter's absences.

49. Ritt commented in his notes that Joyce "became agitated" in justifying her claim that Carpenter is "disruptive" and that his behavior "correlates" to his manic or depressive state." Joyce also told Ritt that both management and other employees knew that Carpenter was "not taking his meds." Ritt cautioned Joyce that that she should not use her knowledge of Carpenter's medical condition "to explain his behaviors.[6]

50. Finally, according to his notes, Ritt told Joyce that as a lead person, she is an "agent" of the Company, and that her actions could be taken into account if Carpenter "were to take action against the Company on the belief that the Company discriminated against him because of a disability."

*[Ritt's meeting with Carpenter]*

51. On July 17, 2013, Ritt met with Carpenter to talk about his harassment complaint.[7] Tim Dove was also present during the meeting. As with Joyce, Ritt asked Carpenter if he would like to have a Union representative at the meeting, but, like Joyce, he declined.

52. Carpenter told Ritt that he and Joyce had had a relationship for 10 years, but that after they broke up, she started "messing" with him at work. As an example, he said that "just today" she pulled a stunt to "mess" with him, when she gave him a note demanding that he return a sewing kit. Dove corroborated Carpenter's assertion, telling Ritt that he had seen the note (though neither one had kept a copy).

53. Carpenter told Ritt that Joyce "messed with him" by working on his band saw machine early in the morning before he got to work, which he said no other Union employee would do to another.

54. Carpenter also told Ritt that "everybody" in the shop sees Joyce's hostile behavior towards him, and when she is absent, "everyone relaxes," echoing what Joyce had said about him.

55. During their discussion, Carpenter freely discussed his bipolar symptoms with Ritt. He told Ritt that his behavior changed based on cycles prompted by stress

---

[6] Joyce told Ritt that during the years they had lived together, she had taken Carpenter to the doctor "hundreds of times, so I know all about the condition."

[7] Ritt's notes of his with Carpenter are in Exh. MC-25.

in his life, and that he sometimes had to take absences from work due to his mood swings. Carpenter also claimed that Joyce's behavior adversely affected his attendance. As he described it to Ritt:

> For example, if I am struggling with my bi-polar condition, I would normally go to work and just stay away from others and deal with my issue. However, I know that I will need to face [Joyce] and her aggravating behavior. So I stay home instead.

56. Carpenter also told Ritt that because Joyce is familiar with his bi-polar condition she knows how to "push his buttons."

57. During the meeting, Ritt asked Carpenter to elaborate on the various allegations that he had made against Joyce in his complaint.

58. With regard to his allegation that Joyce paged him over the loudspeaker to embarrass him in front of others, he told Ritt that that was no longer an issue, as she had recently stopped doing that.

59. With regard to his allegation about Joyce denying him overtime hours, Carpenter accused Joyce of having used her authority as PGL to deny him overtime assignments, accusing him of not working hard enough to justify overtime. Carpenter said that about 6 to 8 months earlier, after he had complained about that to Tim Dove, Dove took over the task of overtime allocation.

60. With regard to his allegation that Joyce tried to get him disciplined, he gave the example of an occasion when Joyce tried to get Dove to write him up for talking too loudly. However, according to Carpenter, when Dove reviewed the shop rules he determined that there was no rule against talking too loud; Dove then took the issue to Kaplinski, who agreed that talking loudly was not a rule violation. Carpenter noted that the shop is a loud workplace, and his talking loudly did not bother anyone.

61. Carpenter told Ritt that after complaining about Joyce both to management and to two of the Union representatives, Bob Monte and Ted Ellefson, an agreement was worked out whereby he and Joyce would avoid dealing with each other as much as possible. According to Carpenter, as part of the agreement Joyce was instructed not to give any direct verbal direction to Carpenter, even though she was his PGL; instead, the supervisor (Dove) would do that. Carpenter also told Ritt that as part of the agreement, management instructed him to "walk away" from Joyce if she approached him with any work instructions or with a "harassing comment."

62. Carpenter also told Ritt that the supervisors and Union stewards had tried to come up with a way to keep him and Joyce apart, by transferring one of them to another work area. However, Carpenter said that he was told that the employee who moved would probably lose pay as a result. Carpenter also told Ritt that he

did not want Joyce fired as a result of his complaint, and that he just wanted her behavior to end.

63. During the meeting, Ritt asked Carpenter if ever said things to aggravate Joyce and he admitted that a few months earlier, he "swore" at Joyce when she did something to intentionally "push his buttons." However, he told Ritt that he had not spoken to her since.

*[Ritt's discussions after meeting with Joyce and Carpenter]*

64. After meeting with Joyce and Carpenter, Ritt spoke to Dove and Kaplinski, as well as some union representatives regarding some of the allegations that Carpenter had made in his harassment complaint. They corroborated some of his allegations, including his claim that she had sent him threatening notes, and that she would often complain about his lack of productivity.

65. Sometime after meeting with Carpenter, Ritt spoke to Dove about how to resolve the conflicts between Joyce and Carpenter. According to Ritt's notes of their conversation, Dove told him that back in February of 2013, when there was a "flare-up in relations" between Carpenter and Joyce, he had drafted an agreement that both Carpenter and Joyce signed Management and the Union asked both people to sign. Dove also told Ritt that Carpenter had signed "willingly" in order to reach a resolution but that Joyce was "hesitant to sign, but eventually did so." Dove also noted that up to that point, the Company had not been able to not find a way to move Joyce or Carpenter to another assignment without a loss in pay.

66. Ritt also spoke to Kaplinski to discuss possible ways to separate Carpenter and Joyce. According to Ritt's notes, Kaplinski told him that Carpenter had recently posted for a job in another area of the plant, but it was likely that he would withdrawing from consideration, as he had had apparently done that on prior occasions.

*[July 25, 2013]*

67. **Soon after Ritt's interviews with Carpenter and Joyce, Kaplinski felt that some kind of immediate action needed to be taken regarding the ongoing conflicts between Carpenter and Joyce, which he felt were continuing to disrupt the workplace. Kaplinski decided to issue a written order to both of them instructing them to refrain from any contact – direct or indirect – with each other, and informing them that if either one of them violated the order, they would be subject to disciplinary action.**

68. On July 25, 2013, Kaplinski prepared the following order, which he addressed to both Carpenter and Joyce (emphasis in original):

*This memo … addresses your unacceptable work place behavior.*
*Effective immediately you both are given this DIRECT ORDER by me.*

*"YOU ARE TO HAVE NO DIRECT OR INDIRECT CONTACT OR*
*COMMUNICATION WHATSOEVER WITH EACH OTHER AS LONG AS YOU ARE*
*EMPLOYED BY MILWAUKEE CYLINDER. ALL QUESTIONS ARE TO BE*
*ADDRESSED BY YOUR SUPERVISOR."*

*Failure to comply with this DIRECT ORDER is a violation of item number eight under*
*serious violations in the Shop Rules … The rule states: "Failure to comply with a*
*direct order of a supervisor, except where there is a legitimate question of personal*
*safety involved."[8]*

*The occurrence guidelines for Serious Violations will be followed.*

69. Underneath the order, there were blank lines where Carpenter and Joyce were supposed to sign and date the forms. There were also signature lines for Tim Dove, representing the Company, and for Ted Ellefson, representing the Union.

70. Kaplinski gave the document to Dove and asked him to present copies to Carpenter and Joyce for their signature. He also instructed Dove to return the order to him after Carpenter and Joyce had signed it.

71. On July 25, 2017, the date that Kaplinski asked Dove to give the order to Carpenter and Joyce, and to ask them to sign it, Carpenter was away on vacation. He was also on vacation the next day and did not come back to the plant until two days later, on Saturday, September 27, 2013, to work an overtime shift.

72. As for Joyce, on September 25, 2013 she sustained a workplace injury that day, when some tube fell on her shoulder, and she had to leave the plant to be seen at a medical facility.

73. The evidentiary record is unclear as to when, or even whether, Dove gave copies of Kaplinski's July 25th order to Joyce and Carpenter. Kaplinski acknowledged that he never got back signed copies of his order, and he never followed up with Dove to confirm that he had delivered copies of the order to Joyce and Carpenter. The only copy of the July 25th order that is in the evidentiary record is devoid of signatures.[9]

74. **Although Kaplinski never got signed copies of his July 25th order, he assumed that Dove had followed through on his instructions and had given copies of the order to both Carpenter and Joyce. Accordingly, going forward, Kaplinski believed that both Joyce and Carpenter knew that they**

---

[8] The rule that Kaplinski quoted in his order is actually Shop Rule No. 9, not No. 8. See Exh. MC-5.
[9] See Exhibit MC-3.

**had been ordered to avoid direct and indirect contact with each other and that they would be subject to disciplinary action if they violated the order.**

*[Shop Rules; Progressive disciplinary process]*

75. The "Shop Rules" cited by Kaplinski in his July 25th order are a set of work rules that all production employees at Milwaukee Cylinder are required to comply with.[10] If an employee violates a rule, he or she is subject to disciplinary action.

76. Under the Contract, the Company must have "just cause" to impose any form of disciplinary action, up to and including a decision to discharge an employee.

77. Rule violations are divided into several categories, including "Most Serious," "Serious," "Less Serious," "Attendance Violations," and "Quality & Employee Productivity and Efficiency Violations." For each category, the rules outline the progressive disciplinary steps that may be imposed for each successive "occurrence" of a violation.

78. As noted above, Kaplinski's order referenced a Serious Rule Violation (i.e., "*Failure to comply with a direct order of a superior, except where there is a legitimate question of personal safety involved*"). For Serious Violations, the Shop Rules state that the following disciplinary actions that will be taken for successive occurrences that take place within a two-year period:

   - First occurrence: a one-day layoff.[11]
   - Second occurrence: a three-day layoff.
   - Third occurrence: a five-day layoff.
   - Fourth occurrence: discharge.

*[Grievance Procedure]*

79. Under the Union Contract, employees have the right to file grievances, including grievances challenging the validity of a disciplinary action. Article 4 of the Contract contains a grievance procedure that outlines the steps for filing and responding to grievances.

80. Under the grievance procedure, aggrieved employees may first try to resolve their concerns by speaking to their supervisor (or "cell leader" in Milwaukee Cylinder parlance). If the issue is not resolved at that stage, the Contract sets forth a three-step procedure for filing a formal written grievance (using forms provided by the Union):

---

[10] The rules are contained in Exh. MC-5.

[11] Although the Shop Rules use the term "layoff," both the Company and Union use the terms "layoff" and "suspension" interchangeably to denote forced time off work without pay. Accordingly, some of the disciplinary actions and grievances that will be discussed herein use the term "suspension" rather than "layoff."

*Step 1. [The] grievance [is] filed with the cell leader.[12] The cell leader will write his/her decision on the issue within ... (24) hours after the grievance is filed.*

*Step. 2. If the decision of the cell leader is not agreed to by the grievant a request may be made to the Superintendent[13] for review within five (5) working days after the decision by the cell leader. If such request is made, the Superintendent will write his/her decision on the issue within ... (48) hours after it is submitted to him/her for review.*

*Step 3. If the decision of the Superintendent is not agreed to by the grievant, the grievance may then be reduced to writing and then presented to Management for review within ten (10) working days after the date of the decision by the Superintendent ...[14]*

81.   If a grievant pursues a grievance to Step 3, the grievance procedure states that a joint meeting of management and Union representatives will be held to discuss the grievance; it also states that the Union's business representative[15] may participate in the meeting on behalf of the grievant.

82.   If a grievance is not settled through the three steps described above, the Union has 30 days after management rules on a Step 3 grievance to decide whether to pursue the grievance to arbitration through the Federal Mediation and Conciliation Service in Washington, DC.

*[Joyce's first disciplinary occurrence]*

83.   On Monday, July 29, 2013, both Joyce and Carpenter were at work. Sometime that day, Carpenter approached Tim Dove to complain that Joyce had been "harassing" him by turning off his radio whenever he left his work area, and that she had done it again that morning while he was on his mid-morning break.

84.   Later that day, after Carpenter complained about his radio being turned off by Joyce, Dove asked Joyce if it was true that she turned off Carpenter's radio. She acknowledged that she turned off Carpenter's radio at lunchtime and when he is on break.[16]

85.   Later that day, July 29, 2013, Dove handed Joyce a notice of "Serious Discipline" informing her that she was being disciplined for a violation of Shop Rule 9 by "[failing] to comply with a direct instruction from a Supervisor," for turning off Carpenter's radio. A box was checked on the form to indicate that she was being given a one-day layoff as discipline for a "first occurrence," in accord with the progressive discipline policy, cited above. After being handed the discipline, Joyce was sent home on a one-day layoff.

---

[12] Tim Dove was the "cell leader" who handled Joyce's Step 1 grievances.
[13] Kaplinski was the "Superintendent" who handled Joyce's Steps 2 and 3 grievances.
[14] The Union Contract states that any of the time limits set forth in the grievance procedure "may be extended by mutual agreement of the parties." See Article 4.06.
[15] Scott Parr, the Business Agent for District l0, handled all of the Step 3 grievances discussed herein.
[16] See Exhibits MC-21 and U-8.

86.  On July 30, 2013, Ritt issued a total of four letters to Joyce and Carpenter (two letters to each of them). Ritt wrote the letters to inform them of the conclusions that he had reached after completing his investigation of Carpenter's harassment complaint. Two of the letters were identical letters that he gave to both Joyce and Carpenter. The other two letters, one of which he gave to Joyce and one of which he gave to Carpenter, were similar but not identical. Copies of all four letters were also sent to representatives of the Company, including Kaplinski and Dove, and to representatives of the Union (including Ted Ellefson with Local 1862 and Scott Parr with District 10.

87.  In the letter that Ritt sent to both Joyce and Carpenter, he started by noting that after receiving Carpenter's complaint, he had met with each of them separately to listen to their respective "explanations and allegations." He then went on to state his conclusions (emphasis added):

> *Both employees are union members. Both are long-term employees of the Company. Sue Joyce is the Process Lead Person for the area in which John Carpenter works. Both are well-aware of the plant rule, as well as the process for reporting transgressions that take place in the shop. <u>Both employees acknowledge that their issues with each other stem from a prior personal relationship that ended several years ago.</u> Both employees state they seek an outcome in which neither party is terminated or suffers monetary loss. <u>Both state that they want the aggravating behavior to cease.</u>*
>
> *<u>Management and Union representatives agree that several measures have been taken to reach a resolution that is satisfactory to both parties. However, incidents continue to take place that disrupt the work of the two employees as well as the work of other employees Management and Union representatives have spent excessive hours trying to receive a resolution.</u>*
>
> *<u>Based on my investigation, I do not find proof of behaviors that rise to the level of harassment based on protected class status under the law or under the Actuant Corporation standards. However, I believe that both parties may have violated plant rules of conduct. Those behaviors have been addressed … however, such behaviors continue.</u>*
>
> *Future incidences will be addressed under the plant rules of conduct. Each employee will receive an individual statement to this effect. Management may change the job assignment of one or both employees that may or may not result in less pay for the affected employee.*

88.  In the separate letter that he addressed to Joyce, Ritt listed his conclusions regarding her conduct toward Carpenter (emphasis added):

> *Based on my meeting with you and on my discussion with Management and Union representatives, I have concluded the following:*
>
> *1. You are a valued and committed employee.*

2. *You profess to want an outcome that ends behavior by John Carpenter that causes you aggravation.*
3. *You deny behavior that causes John Carpenter aggravation.*
4. *Despite your contentions, I find that you continue to behave in a way that continues the aggravation of John Carpenter ... For example, you do not abide by the agreement (approved by management and by the union) that you will not have person-to-person oral conversation with John Carpenter in the workplace ... Additional behaviors on your part perceived to be intentional efforts to aggravate John Carpenter include frivolous recommendations for discipline of John and unnecessary operation of John's assigned machine when he is not present.[17]*
5. *Your perception of John's medical condition is understandable in light of your prior long personal relationship. However, you are cautioned (as a Process Lead Person) to not use your diagnosis of his condition as a basis for taking inappropriate action toward John in your leadership role.*

89. In the letter that Ritt addressed to Carpenter, he stated, in relevant part, the following (emphasis added):

> *Based on my meeting with you and on my discussions with Management and Union representatives I have concluded the following:*
>
> 1. *You are a valued and committed employee.*
> 2. *You profess to want an outcome that ends behavior by Sue Joyce that causes you aggravation.*
> 3. *You deny behavior that causes Sue Joyce aggravation.*
> 4. *Your perception of your interactions with Sue Joyce in the workplace is substantiated to a large degree by others. However, your behaviors (whether reactions to her behavior or instigated by you) have at times contributed to the continuation of the personal disputes between the two of you. Your self-revelation of your medical condition that may contribute to this behavior is admirable, but that is not justification for inappropriate behavior by you in the workplace.*

90. Ritt ended his separate letters to Joyce and Carpenter with the same two paragraphs in which he stated how the matter would be handled going forward: (emphasis added)

> *Management will pursue one or more remedies if your behavior continues: Discipline up to and including discharge under the plant rules of conduct; or reassignment of you to another job that may include a reduction in your pay rate.*
>
> *You continue to have several methods for resolving future disagreements with [the other one] which include appealing to the union steward, to your supervisor [Dove], to the local Operations Leader [Kaplinski] and to me. Be aware, however, that frivolous and unsubstantiated complaints will not be acceptable.*

---

[17] The ALJ believes that Ritt's statement in his letter regarding Joyce's "unnecessary operation" of Carpenter's machine was referencing the allegation Carpenter made during his meeting with Ritt on July 17th, i.e., that Joyce sometimes ran the band saw in the morning before he arrived at work (See Exh. MC-25, p. 1), which was apparently something that she was not authorized to do. However, during her testimony at hearing, Joyce indicated that believed that Ritt was referring to the occasions when she operated the band saw because Carpenter was absent for an entire shift, which was something that she *was* authorized to do.

91.   On July 31, 2013, Joyce submitted a grievance protesting the Serious Discipline that Dove gave her on July 29th for turning off Carpenter's radio.

92.   In her grievance, Joyce expressed her view that the discipline was "unjust and unfair," since, she argued, turning off Carpenter's radio "did not compare" to what she alleged were Carpenter's violations of the "same no-contact rule." On that point, Joyce stated that on July 10th, Carpenter had approached her during her lunch break to warn her that she should "watch it" because she was going to be moved to 2nd shift to a lower paying job and that he would "get her job." Joyce further stated that she had reported Carpenter's comments to Dove the same day, but that as far as she knew, Carpenter was not disciplined for his comments under the no-contact rule.[18]

93.   After Joyce filed her grievance, Parr received a copy of the grievance and found out about the disciplinary notice that she had been about the radio incident. At some point after that, Parr asked Joyce about the incident, and she admitted that she had in fact turned off Carpenter's radio on the day in question, although she argued that she was within her rights to do so, as employees often turned off other employees' radios. Parr reminded her that she needed to leave Carpenter alone and that turning off his radio was considered a violation of the no-contact order.

94.   After receiving a copy of the July 29th disciplinary action, Parr asked both the Company and the Union to notify him if and when any other disciplinary actions were issued against either Joyce or Carpenter.

*[Other events on July 31, 2013]*

95.   After reading the letters that Ritt had issued on July 31, 2013, Parr decided to go the Milwaukee Cylinder plant to meet again with Joyce and Carpenter. To Parr, the letters indicated that the Company believed that Joyce and Carpenter were still engaging in inappropriate conduct. On July 31, 2013, Parr went to the plant to meet with both of them.

96.   On July 31, 2013, after Parr arrived at the plant, Kaplinski sent Ritt a email to alert him to another issue that arisen regarding Joyce and Carpenter, i.e., that Carpenter was upset because Joyce had been complaining about his productivity. Kaplinski also wanted to let Ritt know that Scott Parr from District 10 had just come to the plant to meet with Carpenter and Joyce (emphasis added):

---

[18] It should be noted, however, that Carpenter's alleged comments to Joyce on July 10th occurred two weeks *before* Kaplinski issued his July 25th no-contact order. During her testimony at hearing, Joyce did not provide any examples of any conduct by Carpenter *after* July 25th in which he allegedly violated the no-contact order.

> *I just wanted you to know that Sue and John are at it again. Sue is sticking her nose] into John's production levels and that's upsetting him.*
>
> *Scott Parr is here talking with the stewards and both John and Sue about the entire situation, not just [about today]…*
>
> *The union stewards agree with me that Sue violated the no contact rule but asked me not to do anything until Scott has a chance to discuss the situation with both of them and then me.*

97.    On July 31ˢᵗ, Parr met with Joyce and Carpenter again separately. This time he stressed how important it was for them to stop their behavior and to warn them that further conflicts could lead to one or both of them getting terminated.

98.    When Parr met with Joyce he again explained that she should not have any contact whatsoever with Carpenter, directly or indirectly. He said told her she should not talk to him or look at him, and that she should also refrain from complaining about his productivity, attendance, or whether he was staying at his work station – all matters that should be handled by his supervisor, not by her. Once again Joyce said that she felt that her job as a PGL required her to look at Carpenter's productivity, efficiency, and attendance; Parr tried to disabuse her of that notion, telling her again that those matters were to be dealt with by management, not by her.

99.    Parr also asked both Joyce and Carpenter whether either of them would consider moving to second shift as a solution to their ongoing conflict. Parr told them that he thought that management would agree to it, if one of them agreed to move to second shift. However, they both told Parr that they refused to consider moving to second shift.

100.   After the meeting, Parr met with Kaplinski and told them that he had impressed upon both Joyce and Carpenter the importance of avoiding any contact or getting into any kinds of conflict in the workplace. Parr also indicated that at that point neither one would accept a transfer to a second shift.

*[Management response to Joyce's grievance]*

101.   In early August of 2013, Dove gave Joyce a written response to her grievance. In his response he referred to the meeting that he had with Joyce and Carpenter on February 20, 2013 (emphasis added):

> *During that conversation both Susan and John were told to have no contact with each other and both agreed. On 2/21/2013 both parties signed documentation that stated neither one was intimidating/harassing. On 7/29, John Carpenter approached me and I was told that Susan was turning off his radio when [he was] away from his work area. When asked, Susan replied yes. It is not for Susan to decide whether anyone's radio much less John's, should be turned off as this is the property of John*

19

*... Therefore Susan was considered in violation of the direct order of a superior and given the one day suspension.*

*[Joyce receives 2nd occurrence discipline on August 5th]*

102.  Sometime on the morning of August 2, 2013, Joyce called her supervisor, Tim Dove, to complain that the assemblers needed more tubes to complete an order, and she claimed that Carpenter had only produced one tube because he was moving all over the shop, or words to that effect.  She wanted Dove to get Carpenter to go back to work on the tubes.[19]

103.  Dove later told Kaplinski about the comments that Joyce had made about Carpenter. Kaplinski felt that Joyce's negative comments about Carpenter's productivity were inappropriate, inasmuch as she was not a supervisor and did not have the authority to monitor another employee's productivity; further, he felt that her comment about Carpenter not being in his work area was intended to get Carpenter in trouble with his supervisor. Kaplinski and Dove concurred that Joyce's comments about Carpenter violated the no-contact order and warranted the issuance of another disciplinary action.

104.  On August 5, 2013, Dove gave Joyce her second "Serious Discipline" notice for a "violation of a direct instruction of a supervisor," in violation of Shop Rule No. 9. She was informed that it was being given to her in connection with the comments that she had made to Dove about Carpenter on August 2nd, as discussed above. As the second occurrence of a serious violation, Joyce was given a three-day layoff, as set forth under the Company's progressive discipline policy.

105.  A copy of the August 5th disciplinary notice was given to Parr.  Sometime after receiving the notice, Parr asked Joyce about the incident for which she was disciplined, she acknowledged that she had complained about Carpenter's productivity and the fact that he was often not at his work station.  Once again, Parr told Joyce that she should refrain from such conduct in the future.

*[Joyce files more grievances]*

106.  On August 8, 2013, Joyce wrote another step grievance regarding the first occurrence discipline that she had been given on July 29th. Joyce noted in her grievance that "[e]veryone in the shop" turns off their radios as a "common courtesy" to other employees during breaks, implying that she had a right to turn off Carpenter's radio, since he had left it on during a break.

107.  On August 9, 2013, Joyce wrote a first-step grievance regarding the second occurrence discipline she had been given on August 5th.   She argued in her grievance that one of her responsibilities as a PGL was to facilitate "on time"

---

[19] As Joyce later explained in a grievance (Exh. C-9, p. 3), the regular operator of the leadwell lathe , **Jeremy Flynn**, was on vacation all week, so another operator (Carpenter) was assigned to produce tubes on the lathe.

20

delivery of the work coming out of her work group, and therefore it was within her responsibilities to complain about Carpenter not producing enough tubes; further, she, argued, since had not directly complained to Carpenter himself, "per instructions of management," the disciplinary action was "unjust and unfair."

108. Shortly after Joyce filed her grievance on the discipline she had received on August 5th, Dove provided her with following written response denying her grievance (emphasis added):

> *Susan [Joyce] called me and asked me I could get John Carpenter back to his machine, that John had only produced one tube and was bopping all over the shop. It is not for Susan to report John's productivity, but to help schedule work in her area. Therefore the management found this to be a 2nd violation of a direct superior .....*

109. On August 28, 2013, Joyce filed two additional grievances, a third grievance on the disciplinary action of July 29th, and a second grievance on the disciplinary action of August 5th.

110. In her grievance regarding the July 29th discipline, Joyce argued that since other employees had turned off Carpenter's radio on the past, her doing so should not be considered a form of harassment in violation of the order. In her grievance she also referenced the "no harassment" document that she said she and Carpenter had signed on February 21, 2013 (and noted that she had signed it "under duress").

111. In her grievance regarding the August 5th discipline, Joyce noted, among other things, the following:

- That she and Carpenter had both signed a Company/Union document stating that there would be no further harassment between herself and Carpenter.

- That she believed she should not have been disciplined for complaining about Carpenter's failure to produce enough tubes on August 2nd since it was a part of her job as the PGL of Tubes and Tie Rods group to facilitate on-time delivery of a job order, and on that day more tubes were needed in order to complete the order.

- That she never used the term "*bopping around*" in her "*entire life*" and that therefore Dove's statement (in is response to her grievance) that she had said that Carpenter was "bopping around" all over the plant was a lie.[20]

---

[20] Although Joyce denied using the term "bopping around," she did not deny that she had said something to the effect that Carpenter was moving around the shop a lot. Thus, although the ALJ credited Joyce's assertion that she did not use the term "bopping around," the ALJ believes that she *did* say something to Dove on the day in question to the effect that Carpenter was travelling all over the plant rather than staying in his own work area; that would be consistent with Joyce's repeated testimony during the hearing

- That although she had made several requests to management for a copy of the harassment complaint that Carpenter had filed against her, the Company refused to give her a copy. She also noted that Ted Ellefson, one of the Union representatives, had made several attempts to get the Company to provide a copy of the harassment complaint, "per his job as head union steward," but the Company had refused his requests.

*[Management's responses to Joyce's grievances]*

112. On September 6, 2013, in his capacity as Operations Leader, Kaplinski provided management's written responses to both of Joyce's second-step grievances, i.e., one grieving the "first occurrence" discipline she was given on July 29th and one regarding the "second occurrence" discipline she was given on August 5th.

113. Kaplinski provided two separate responses, one for each of the disciplinary actions, but each one stated the same thing, quoted below, which included a verbatim quote from the no-contact order that he issued on July 25th (emphasis added):

> *After careful evaluation of all the facts and talking with management and the union representatives, I find that you violated a direct order from a supervisor which was "You are to have no direct or indirect contact or communication whatsoever with John Carpenter as long as you are employed by Milwaukee Cylinder ...for which you received ... a layoff.*

> *I agree with the discipline and therefore feel the company has no obligation to drop the discipline.*

*[Meeting held on September 19th]*

114. As noted previously in this decision, the Contract's grievance procedure provides that third step grievances are supposed to be discussed at a joint meeting of representatives from both the Company and the Union.

115. On September 19, 2013, a joint Management/Union meeting was held to discuss the third-step grievances that Joyce had filed with regard to both of the disciplinary actions that she had received to date (i.e., the first-occurrence discipline of July 29th, and the second-occurrence discipline of August 5th).

116. The meeting was attended by representatives of both the Company and the Union, including Kaplinski, in his capacity as Operations Leader, and Scott Parr in his capacity as Business Agent for District 10. Joyce herself was also present at the meeting.

---

that Carpenter spent an inordinate amount of time away from his work station. (Carpenter testified that as part of his job, he needed to move around a lot in order to deliver parts to different areas of the plant).

117. During the meeting, the Union's position was that the two disciplinary actions should be removed from Joyce's record and that she be made "whole" by being compensated for the pay she lost due to her one-day lay-off (or suspension) on the first occurrence and the three-day lay-off on the second occurrence, for a total of four days of back pay.

118. On September 20, 2013, Kaplinski sent a letter to the Union with his decision to deny both grievances. In his letter, Kaplinski stated that in both instances, Joyce "was given a direct order by her supervisor several times, as well as myself not to have any direct or indirect contact with John Carpenter which she violated." Accordingly, Kaplinski wrote, "[y]our request to make her hole [sic] and pay her for the [days she was laid off] and have the violation[s] removed from her record is denied."

*[Another disciplinary action]*

119. On Friday, November 1, 2013, another incident occurred that involved Joyce and Carpenter. In a written account that Dove provided to Kaplinski on November 4, 2013, Dove described the first part of the incident as follows (emphasis added):

> *On 11/1/2013 Susan Joyce called me at approximately 1:30 pm. She asked me if I could have John Carpenter move some material. I replied with a yes. I paged John and did not respond. Within a few minutes after the page, Susan called back and asked if John returned my page. <u>She said that she had watched John for half an hour. She appeared to be upset and asked me to come to the band saw. I asked her what the issue was and she said, " … John is just sitting there eating candy."</u>*

120. After speaking to Joyce Dove then told both Kaplinski and some of the Union representatives about what Joyce had just said. Dove then returned to talk to Joyce, bringing Ted Ellefson, Bob Monte, and Terry Sullivan. According to Dove's written account, the following conversation then transpired:

> *Susan said that she had watched John for half an hour. Susan exclaimed that there had been material on the floor for 3 weeks. I asked her the reason for the 2nd call and the response was, "I didn't know if John heard the page. She claimed that there was material on the floor and that John should have put it away. She said that she had put [the] material away and it took only13 minutes.*

121. According to Dove's report, he and the Union stewards then went to speak to Carpenter to get his side of the story regarding the material that Joyce had wanted him to move out of his work area:

> *[Carpenter] said that some of the material [that Joyce wanted him to move] was staged for his next job. Some of the material had no place for it to be [moved to]. I asked him about some ductile … on a skid and he said that he didn't see it behind the rack with tubes. <u>[Carpenter said] he felt he was being harassed.</u>*

122. On Monday, November 4, 2013, Dove discussed the above incident with Kaplinski, who came to the conclusion that it was another instance of Joyce

indirectly harassing Carpenter by trying to get him in trouble with management, in this case about an issue that she could have easily resolved herself. He felt that instead of asking Dove to page Carpenter to put away some material, she could have just done it himself, as she eventually did in just 13 minutes. Kaplinski also felt that Joyce had violated both the no-contact rule and the no-harassment agreement by admittedly "watching" Carpenter for half an hour. Accordingly, Kaplinski decided that another disciplinary action should be issued against Joyce.

123. On November 4, 2013, Joyce was given another written disciplinary notice in connection with her conduct on November 1, 2013. As stated on the notice, she was being given a five-day layoff for her "third occurrence" of a serious violation for violating the "direct order of a superior." The notice informed Joyce that she would serve her five days of layoff from November 5th to November 11th.

124. The disciplinary notice stated that if Joyce incurred a fourth occurrence of a serious violation, it would result in her discharge.

*[Joyce files ERD complaint on November 7th]*

125. On November 7, 2013, Joyce filed a discrimination complaint against Milwaukee Cylinder with the Wisconsin Equal Rights Division ("ERD"), which was designated as ERD Case No. CR201303179.

126. In her complaint, the Joyce alleged that the Company had discriminated against her on the basis of her sex in violation of the Wisconsin Fair Employment Act ("WFEA"), with regard to the terms and conditions of her employment, and she referred to the three disciplinary layoffs that she had received for allegedly violating an order to have no contact in the workplace with a male co-worker.

127. On November 26, 2013, the ERD mailed a copy of Joyce's complaint to Milwaukee Cylinder.[21] There is no evidence in the record as to when the Company actually received the complaint.

128. Shortly after the Company received the complaint in the mail, the complaint was given to Kaplinski for his review. He forwarded the complaint to Don Ritt to handle.

129. Neither Kaplinski nor Ritt said anything to Joyce about her ERD complaint.

---

[21] There is no evidence in the record regarding the date when the complaint was mailed to the Company. However, based on the ERD's internal computer tracking records, the ALJ has taken administrative notice that the ERD originally mailed a copy the complaint to the Company on November 26, 2013.

130. On November 18, 2013, Joyce filed a grievance regarding the third occurrence discipline she received on November 4, 2013. In her grievance, she denied that she had done anything wrong on November 1st by asking to have Carpenter put away certain material. She also accused Dove and Carpenter of "together orchestrating all of this," and she alleged that Dove "continues to cover for all of [Carpenter's] work ... and behaviors."

131. In her grievance, Joyce noted that although she had repeatedly asked for a copy of Carpenter's "sexual harassment" complaint, the Company refused to give it to her. She noted that she had no idea what was "sexual" about his claim.

132. On December 2, 2013, Dove wrote a terse response to Joyce's first step grievance of November 18th, stating only that "[t]he discipline was given in violation of a direct order of a superior."

133. On December 3, 2013, Joyce wrote the following Step 2 grievance in response to Dove's terse response:

> *I both need and deserve a detailed response to my [first-step] grievance to move on to second-step. I am once again asking the Company to provide me with a copy of the initial sexual harassment complaint [that Carpenter] filed against me.*

134. On December 5, 2013, Kaplinski issued a written response to Joyce's Step 2 grievance. The first part addressed her request that the Company drop the disciplinary action:

> *After careful evaluation of all the facts I find that you violated a direct order from a supervisor which was "You are [to] have not direct or indirect contact or communication whatsoever with John Carpenter as long as you are employed by Milwaukee Cylinder ..." for which you received a five day layoff ...*
>
> *I agree with the discipline and therefore feel the Company has no obligation to drop the discipline.*

135. In his response, Kaplinski also addressed Joyce's request for a copy of Carpenter's harassment complaint (emphasis added):

> *In response to your request for a copy of the initial harassment claim, Don Ritt, the HR Manager investigated the allegation of harassment [that Carpenter] made against you. As stated in [Ritt's] answer, it was not found to be a violation of any regulation or company policy regarding harassment based on sex or any [other] protected status. There is no obligation to present the original allegation to you. That investigation found that the issue was the result of long-standing non-work related disagreements between two people. The failure to resolve those disagreements is now disrupting the work place. Both parties are expected to adhere to direction given by the Company if one or both employees expect to continue to work at Milwaukee Cylinder.*

136. After Kaplinski's December 5th statement denying Joyce's grievance, Parr decided to try to do something to try save Joyce's employment at Milwaukee Cylinder. Parr knew that if Joyce received another disciplinary occurrence, it would result in her termination. He also felt that so far, her grievances lacked merit, and that the Company had just cause with regard to all of the disciplinary actions that it had imposed on Joyce thus far, so he did not think that the Union would prevail if it took any of her disciplines to arbitration. With that in mind, Parr decided to ask the Company if it would be willing to go to mediation, with the goal of reaching some kind of agreement that would protect Joyce's job and that would also put an end to the disruptions resulting from her ongoing issues with Carpenter.

137. Parr presented his proposal for mediation to Kaplinski, who agreed to go to mediation. Arrangements were then made to have a federal mediator from the Federal Mediation and Conciliation Service conduct a mediation conference at Milwaukee Cylinder on December 10, 2013.

138. As scheduled, the mediation took place on December 10, 2013. The mediation session was facilitated by **Douglas Drake**, a federal mediator. In addition to Joyce, the attendees included Parr and one or more representatives for the Union; and Kaplinski, Ritt, and Dove for the Company.

139. At the end of the mediation, the parties reached an agreement. The next day, Kaplinski put the terms of agreement into writing.

140. On December 11, 2013, Kaplinski prepared a letter stating the terms of agreement, with signature lines on the bottom for Joyce and for representatives of both the Company and Union. In his letter, Kaplinski stated the terms of agreement as follows (emphasis added):

> *In full resolution of the grievance regarding the [discipline issued on November 4, 2013], the company agrees to administratively adjust the last discipline action from a 5-day suspension to a 3-day suspension with no back pay required. This effectively adds an additional step to the discipline process for [Joyce] regarding this matter.*
>
> *With this resolution, [Joyce] agrees that [her latest] grievance and past grievances [regarding her disciplinary actions] lacked merit, and [she] agrees to hold the Company and the Union harmless regarding the resolution of any and all current and past grievances …*

141. At the end of his letter, Kaplinski noted the following:

> *Once all parties have agreed and signed this document, Milwaukee Cylinder will remind both John Carpenter and Sue Joyce of the direct order, not to have any direct or indirect contact with each other.*

142. On September 12, 2013, Joyce, Parr, and Kaplinski all signed the letter to indicate their acceptance of the agreement as set forth in the letter.

143. In accordance with the agreement, the Company changed its records regarding Joyce's Third Occurrence discipline of November 4th, effectively converting it into the equivalent of a Second Occurrence. That was significant for Joyce, because it she had not had one of her occurrences removed from her record, her next occurrence would be considered her fourth, and would result in her termination.

144. After the mediation, Parr asked Joyce again if she would consider moving to second shift as a way to resolve her conflicts with Carpenter, and Joyce said she would not consider moving to second shift.

*[Incident on December 13th]*

145. On Thursday, December 13, 2013, an employee named **Jeff Pollnow**, who normally worked in another work group, was asked to help out in the Tubes and Tie Rods area. Specifically, he was asked to run the band saw that day, since the primary operator of the band saw (Carpenter) was assigned to work elsewhere in the plant that day.

146. That day, Joyce had a conversation with Pollnow while he working on the band saw. During that conversation, Joyce said something to the effect that she felt that she was "between a rock and a hard place," apparently with regard to her issues with Carpenter and management. Joyce also mentioned to Pollnow that Carpenter had only cut two tubes on the band saw earlier that day. Pollnow then expressed his irritation about having to work on another employee's machine because the other employee was not being productive, or words to that effect. Joyce's responded by saying something to the effect that if he felt that way, he should speak to someone in management about his concerns.

147. A short time later Pollnow went to see Kaplinski. He told Kaplinski that Joyce had told him that she felt like she was "between a rock and a hard place." Pollnow also told Kaplinski that that he had been assigned to help out on the band saw that day and that he had been told that Carpenter had only cut two tubes on the band saw that day.

148. After Pollnow left Kaplinski's office, Kaplinski called Dove and told him about his conversation with Pollnow. He asked Dover to check Carpenter's production for the day. Dove reported back later and indicated that he was satisfied with Carpenter's production. Kaplinski also learned later that both Dove and a Union representative had spoken to Pollnow (separately), and that Pollnow had confirmed that he had come to see Kaplinski that day at Joyce's suggestion.

149. On Monday, December 16, 2013, Kaplinski had a conversation with Don Ritt to inform him of what he had learned about the December 13th incident. Kaplinski memorialized his conversation in an email to Ritt.

27

150. **Sometime within the next day or two, Kaplinski decided that Joyce's conduct on December 13th warranted the issuance of another disciplinary action. Kaplinski felt that by encouraging Pollnow to talk to management about Carpenter, Joyce had once again violated his order not to have direct or "indirect" contact with Carpenter (only three days after the mediation and two days after signing the mediation agreement), by encouraging a co-worker (Pollnow) to go to management to complain about Carpenter's productivity. Kaplinski considered that conduct to be an "indirect" way for Joyce to try to hurt Carpenter by getting him in trouble with management. Although Joyce was a PGL, she was not a supervisor; therefore, in Kaplinski's view, she had no basis for assessing Carpenter's productivity.**

*[Third occurrence discipline issued December 19th]*

151. On Thursday, December 19, 2013, Kaplinski issued a memo to Joyce informing her that she was being issued another disciplinary action, which he was characterizing as a Third Occurrence Serious Violation, resulting in the imposition of a five-day layoff.[22]

152. In his disciplinary write-up, Kaplinski started out by noting that on December 10th, a mediation had been held to try to resolve her grievances. According to Kaplinski, as part of that discussion about "appropriate" behaviors (emphasis added),

> *it was agreed that you would not monitor the output of John Carpenter, nor would you prompt others to do so. That was the type of behavior that was causing bad feelings and which had led to numerous disruptive and time-consuming discussions and formal meetings.*

153. Kaplinski then went on to explain the specific incident for which she was being disciplined (emphasis added):

> *On December 13, 2013 you sent Jeff Pollnow to see me about your perception of being between a rock and a hard place. He also made a point of telling me that he was helping out on the [band] saw and that John Carpenter had [only] cut 2 tubes. [And that] it was the perception of Jeff and you that John was not being productive that day.*

> *After speaking to Jeff I spoke to John's supervisor, Tim Dove, and had him check out John's production. John's production met the supervisor's expectations for the day. Both Tim Dove and Terry Sullivan [one of the Union stewards] spoke to Jeff at separate times and both confirmed that Sue had prompted Jeff to approach me to discuss John's productivity. Once again, several people were unproductive because of your behavior.*

---

[22] But for the mediation agreement signed on December 12th, the discipline would have been a 4th occurrence violation, which would have resulted in her discharge.

154. Kaplinski then stated that her behavior on December 13th, as described above, violated his direct order "not to have any direct or indirect contact or communication whatsoever with each other as long as you are employed by Milwaukee Cylinder," he was imposing a third occurrence discipline, which called for a five-day suspension. However, in his memo, Kaplinski informed Joyce that he would allow her to serve her five-day suspension in January of 2014, rather than right away, so that she would still be eligible for holiday pay.[23]

155. Finally, at the end of his disciplinary memo, Kaplinski gave Joyce the following strongly-worded warning (emphasis added):

> *This is one last warning regarding your inappropriate behavior in the work place. It is the type of behavior that led to the progressive discipline, including your suspensions. It is also the type of behavior that was thoroughly discussed by the union, the company and the Federal Mediator with you on December 10, 2013. Further such incidences will lead to further discipline, up to and including discharge.*

*[Kaplinski re-issues his direct order]*

156. On December 19, 2013, the same day that he issued the disciplinary action quoted above, Kaplinski also re-issued the direct order he had previously issued on July 25th. Kaplinski re-issued the order pursuant to the mediation agreement entered into on December 12th, which stated that after the agreement was signed, the Company would "remind both [Carpenter and Joyce] of the direct order, not to have any direct or indirect contact with each other."

157. Kaplinski wrote up separate orders for Joyce and Carpenter, but the two order were identical (emphasis in original):

> *The purpose of this memo is to document that I have review[ed] and confirm[ed] your understanding of the direct order issued by me concerning your unacceptable work place behavior.*
>
> **"YOU ARE TO HAVE NO DIRECT OR INDIRECT CONTACT OR COMMUNICATION WHATSOEVER WITH EACH OTHER AS LONG AS YOU ARE EMPLOYED [SIC] BY MILWAUKEE CYLINDER. ALL QUESTIONS ARE TO BE ADDRESSED BY YOUR SUPERVISOR."**
>
> *Failure to comply with this DIRECT ORDER is a violation of item number [nine] under serious violations I the Shop Rules ... The rule states: "Failure to comply with a direct order of a supervisor, except when there is a legitimate question of personal safety involved." The occurrence guidelines for Serious Violations will be followed.*
>
> *By signing below you are agreeing that you fully understand the direct order.*

---

[23] A employee on a disciplinary suspension during what would otherwise be a paid holiday is not eligible for holiday pay. According to the holiday schedule for 2013, December 23, 24, 25, and 31 were all paid holidays (See Exh. C-1 at p. 16). Accordingly, as a result of Kaplinski's decision to let Joyce start her five-day suspension in January, she was still able to get four days of paid holiday.

158. This time, Kaplinski wanted to make sure that he had a signed copy of the order, unlike what happened with regard to the original order that he issued on July 25th, which was never signed. Accordingly, on December 19, 2013, Kaplinski asked both Joyce and Carpenter to sign the agreement, and they both did so. On the same date (December 19, 2013, Kaplinski and Dove both signed the order for the Company, and Ted Ellefson signed for the Union.

*[Joyce files grievance on January 17th]*

159. On January 17, 2014, Joyce filed a grievance protesting the disciplinary action that she had received on December 19, 2013, for which she served a five-day suspension in early January. In her grievance, Joyce refused to take any responsibility for suggesting to Jeff Pollnow that he complain to management about Carpenter's productivity:

> *I will not take responsibility or [accept] punishment for someone else (Jeff Pollnow) exercising their right to Freedom Of Speech … I did not hold a gun to Jeff's head. Jeff Pollnow went to [Kaplinski's] office on his own accord with a valid complaint … This five-day layoff needs to be dropped and I need to be compensated for my 5 days off work at a job I happen to love …*

160. Sometime soon after Joyce filed her grievance, Parr spoke to her about the Pollnow incident on December 13th that had led to her latest disciplinary action. Parr was shocked when he heard about the incident and was incredulous that Joyce would engage in such conduct, only three days after their mediation and two days after she had signed off on the mediation agreement. Parr also felt extremely frustrated that after making so many efforts to protect Joyce from further discipline, she went and engaged in conduct that he believed she should have known would be considered a violation of the non-contact order and would lead to further disciplinary action.

161. When Parr asked her if it was true that she had told Pollnow to complain about Carpenter's productivity, she acknowledged that she had spoken to Pollnow but denied that she told him to go to management. However, Parr did not find her credible, as two of his Union representatives had told him that when they questioned Pollnow about the situation, he said that he had gone to see Kaplinski to complain about Carpenter at Joyce's suggestion.

162. After the Company denied Joyce's January 17th grievance regarding the Pollnow incident, Joyce filed a follow-up grievance on January 24th stating that she was "[a]sking for company to drop the 5 day suspension from my records without monetary compensation."

163. The Company denied Joyce's January 24th grievance, and the five-day suspension that she received for a third occurrence of a serious violation remained on her disciplinary record.

164. An Overall Equipment Effectiveness (OEE) evaluation is an engineering study that the Company sometimes has its engineers conduct on a particular piece of equipment or machine. An OEE study is designed to measure an employee's productivity and efficiency when using the equipment in question.

165. On April 22, 2014, Joyce operated the band saw for part of the day because Carpenter had been pulled away to work in another area of the plant. That day, Joyce approached **Noah Fiduccia**, one of the Company's industrial engineers. Joyce asked Fiduccia if he would consider doing an OEE study on the band saw. Fiduccia told her that in order to conduct an OEE he would need the approval of his supervisor (**Jim Casey**), as well as the approval of Joyce's supervisor (Tim Dove). He indicated that he would get back to her about whether an OEE could be done.

166. After Fiduccia conveyed Joyce's request for an OEE on the band saw to management, Kaplinski learned of her request. Kaplinski thought her request was odd for two reasons. First, he wondered why she would request an OEE on the band saw, given that it was not her assigned machine. Second, he thought that it was quite odd for an employee to request an OEE at all, since most employees object to having OEE's done at all, since most employees do not like having their productivity or efficiency measured so closely. In fact, Kaplinski had never heard of any employee ever actually requesting an OEE; he only knew of employees objecting to having them done. Kaplinski decided to look into the matter further.

167. When someone in management asked Fiduccia about his conversation with Joyce, he said that Joyce had told him that the reason she was asking for an OEE was to show that the regular operator of the band saw (John Carpenter) was not very productive. Fiduccia also said that Joyce had informed her that while the regular operator of the band saw had claimed had only cut six pieces that day, she was able to cut 200 pieces when she worked on the band saw.

168. **After hearing the Fiduccia's account of his conversation with Joyce, Kaplinski concluded that Joyce had wanted an OEE done on the band saw as a way to prove to management that Carpenter was an unproductive worker. As such, Kaplinski considered her conduct to be another violation of his direct order, as it was an "indirect" way to attack Carpenter and make him look bad in the eyes of management. However, Kaplinski knew that if he gave her another disciplinary action, it would be the fourth occurrence of serious violation, resulting in Joyce's termination. Accordingly, before taking any disciplinary action, Kaplinski discussed the situation with Don Ritt, who, as HR Leader, made all final decisions regarding employee terminations.**

169.  After Ritt was informed of Joyce's request for an OEE on the band saw, he decided that before taking any disciplinary actions against Joyce, he would meet with her to get her side of the story.

170.  On April 25, 2013, Ritt called Joyce in for meeting. A Union representative, Jac Remus, was also at the meeting. When Ritt asked Joyce why she had asked Fiduccia to conduct an OEE on the band saw, which was Carpenter's machine, she initially denied any intent to show that Carpenter was an unproductive worker. However, when Ritt asked her whether she had compared her numbers on the band saw to Carpenter's, she admitted telling Fiduccia that Carpenter had only produced 6 pieces whereas she typically could produce 200.

171.  **After the meeting, Kaplinski and Ritt both concluded that in asking for an OEE on the band saw, Joyce did so with intention of proving to management that Carpenter was a non-productive worker, and, as such, that it constituted another violation of the direct order. On that basis, Kaplinski and Ritt jointly decided to terminate Joyce's employment pursuant to the Company's progressive discipline policy, which calls for discharge after the fourth occurrence of a serious violation.**

172.  After the termination decision was made, Ritt proceeded to prepare a letter of termination.

*[Joyce is informed of termination decision]*

173.  On May 2, 2014, Joyce was handed the letter that Ritt had prepared. The letter informed her that the Company had decided to terminate her employment and that May 2, 2014 would be her last date of work. The letter then went on to explain in detail the basis for her termination. The letter stated that the decision was largely based on the April 22nd incident which it counted as a fourth occurrence of a serious violation. However, the letter also discussed other factors that went into the decision,

174.  With regard to the incident of April 22, 2014, Ritt quoted what he had been told by the industrial engineer whom Joyce had spoken to that day:

> According to [the] industrial engineer, "[Joyce] pulled me aside and asked me if we could implement [an] OEE … on the Small Band Saw … She said the reason for asking for [an] OEE … was to show that the [regular band] saw worker was not being productive. Her words were "So far today he has cut 6 pieces, [but] when … I am running the band saw I will cut 200 pieces."

175.  Ritt then stated the following (emphasis added):

> In our meeting [on April 25th about the April 22nd incident], you denied any intent to allege poor performance on the part of John Carpenter. When I pressed you, you admitted to using the numbers quoted by the industrial engineer. <u>Although you adamantly denied any intent to defame John Carpenter, I find that your action did</u>

176. **In the next part of his letter, Ritt discussed four other recent incidents that he had learned about when investigating the April 22nd incident. Although Joyce had not been disciplined for any of the incidents, Ritt indicated that he considered them to be examples of her continued failure to abide by the no-contact order by continuing to bring Carpenter's "shortcomings" and/or "performance issues" to the attention of management:**

> *In some cases you blatantly identified John by name or position. In other cases you avoided using his name but referred to him as "the regular operator of that machine or "the person in the area" when he was the only person in the area. In these cases, you once again abused normal business practices to defame John Carpenter or you took advantage of other employees to disturb or irritate John Carpenter."*

177. Ritt then briefly described each incident, two of which involved "safety cards:"[24]

- First, Ritt referred to a safety card that Joyce had submitted on April 16, 2014, on which she indicated that metal bands were left on the floor "in front of the band saw." With regard that card, Ritt stated that Joyce could have "chosen to pick up the bandings [herself} and put them in the trash," but by submitting the card, she required the safety team to do an investigation, and she "implied wrongdoing by John Carpenter."

- Second, Ritt referred to a safety card that Joyce had submitted on April 4, 2014 alleging that tubes were stored in an unsafe way on a rack located next to the band saw.[25] According to Ritt, the safety team did not find that the tubes were positioned unsafely and he had been told that the safety team repositioned some of the tubes solely to "appease" her.

- Third, Ritt referred to a recent Training Meeting that Joyce had attended in her role as a PGL.[26] During the meeting, she stated that she wanted John Carpenter to be transferred to the second shift, and she asked whether any of the other PGL's were willing to "take" Carpenter to work in their areas. Ritt stated in his letter that although Carpenter himself was not at the meeting, Joyce knew that people who *were* at the meeting could later tell Carpenter what she had said. Accordingly, Ritt felt that her comments at the Training

---

[24] The term "safety cards" refers to small index cards that employees were supposed to fill out to apprize the Company of any unsafe situation in the plant. When someone submitted a card, the plant's safety team, which includes both management and Union representatives, was then required to investigate the alleged safety issue and take action if deemed appropriate. The safety cards that are discussed herein are contained in Exh. MC-14.

[25] On the card, Joyce indicated that she had been injured in the past due to tubing being stored that way.

[26] These are regular meetings attending by both management representatives and PGL's for the purpose of discussing training and advancement opportunities for employees in the plant.

meeting were another attempt to irritate or aggravate Carpenter through indirect means.[27]

- Fourth, Ritt noted that one of Joyce's co-workers had recently reported to management that she had repeatedly asked him to turn down (or turn off) Carpenter's radio, but that he refused do that anymore. According to Ritt, the employee "was clearly tired of being caught in the middle of the long feud between you and John Carpenter."[28]

178. In the next section of his termination letter, Ritt referenced one of the letters that he had given to Joyce on July 30, 2013 in which he had warned her that if she "continued to behave in a way that continues the aggravation of John Carpenter" she could be subject to disciplinary action, "up to and including discharge."

179. Ritt also noted in his termination letter that the Company had voluntarily agreed to engage in federal mediation on December 10, 2013 and that as a result of the mediation, the Company had "agreed to back up one step in your disciplinary record so that you would not face termination as a result of the next rule violation." Yet, Ritt noted, just a few days later, "you were involved in a new incident for which you were given a final five-day suspension in January 2014," and that disciplinary notice "clearly stat[ed] that termination would be the next step for a subsequent violation."

180. In addition to the federal mediation, Ritt also noted in his letter that the Company had agreed to participate in a mediation session conducted by a mediator from the ERD, in an effort to resolve the discrimination charge that Joyce had filed in November of 2013, but the ERD mediation also failed to resolve the situation.

181. Finally, at the end of the letter, Ritt summarized the basis for the decision to terminate her employment as follows (emphasis added):

> *Your behavior continues to disrupt the work place and antagonize a co-worker who is a fellow union member.*
>
> 1. *The Company has applied the regular disciplinary process (with concessions that gave you additional steps). You have reached the end of that process.*
> 2. *You have used the grievance process under the labor contract … and that has not resolved the disputes between you and John Carpenter.*
> 3. *The Union and the Company jointly employed a Federal Mediator to resolve the disputes and look for a long-term solution. That has not resolved your issues.*

---

[27] When Parr heard about this incident, and that management was planning to discipline Joyce for what she had said at the training meeting (which would have been a 4th occurrence rule violation, resulting in her termination), he tried to convince management not to impose any discipline for her conduct at the meeting. As Parr testified at hearing, he was able to successfully talk management out of taking any disciplinary action in that instance.

[28] It should be recalled that in July of 2013, Joyce received her first disciplinary action for turning off Carpenter's radio, which management viewed as an indirect way to irritate Carpenter.

> 4. *You and the Company jointly employed the [ERD's] voluntary mediation process. That did not result in a solution.*
>
> *The Company is unable to find a resolution to your behavior. Your continued unacceptable behavior now leads to the final step in the disciplinary process, which is termination.*

182. Joyce's employment at Milwaukee Cylinder ended on May 2, 2014, upon receipt of Ritt's letter.[29]

*[Ultimate Findings of Fact]*

183. **Joyce's sex was not a factor in the Company's decision to impose a number of disciplinary actions against her between July and December of 2013. Rather, the decision to impose each of those disciplinary actions was based on the Company's belief that Joyce had in each instance engaged in conduct that violated a serious rule and that warranted disciplinary action under the Company's progressive discipline policy.**

184. **Joyce's sex was not a factor in the Company's decision to terminate her employment in May of 2014, nor was the fact that Joyce had filed a discrimination complaint against the Company in November of 2013. Rather, the Company's decision to terminate Joyce's employment was based on its belief in April of 2014 Joyce engaged in conduct that violated a serious rule, and, as her fourth occurrence of such a violation, warranted her termination under the progressive discipline policy.**

Based on the FINDINGS OF FACT made above, the Administrative Law Judge now makes the following:

## CONCLUSIONS OF LAW

1. That the Respondent, Milwaukee Cylinder, is an "employer," within the meaning of the Wisconsin Fair Employment Act ("WFEA").

2. That the Complainant failed to prove by a preponderance of the evidence that the Respondent discriminated against her on the basis of sex with regard to terms and conditions of employment, as alleged in ERD Case No. CR201303179, in violation of the WFEA.

3. That the Complainant failed to prove by a preponderance of the evidence that the Respondent discriminated against her on the basis of sex with regard to its

---

[29] After her termination, Joyce filed a grievance regarding her termination. This decision does not include any findings regarding those grievances, or any other post-termination events, because her ERD complaints against the Company only allege discrimination up to the point of termination. However, the decision being issued today in the case against the Union, (ERD No. CR201403422) *does* include findings regarding post-employment events, as the gravamen of her complaint against the Union involved its efforts (or alleged lack thereof) to help her get her job back after she was terminated.

decision to terminate her employment, as alleged in ERD Case No. CR201402554, in violation of the WFEA.

4.     That the Complainant failed to prove by a preponderance of the evidence that the Respondent terminated her employment in retaliation for her having filed her first complaint against the Company, as alleged in ERD Case No. CR201402554, in violation of the WFEA.

Based on the FINDINGS OF FACT and CONCLUSIONS OF LAW made above, the Administrative Law Judge now makes the following:

## ORDER

That the complaints in ERD Case Nos. CR201303179 and CR20140254 are hereby dismissed.

Dated at Milwaukee, Wisconsin

SEP 2 9 2017

Rose Ann Wasserman
Administrative Law Judge

## MEMORANDUM OPINION

This case presents a cautionary tale as to what can happen after two co-workers end a romantic relationship but then have to continue working together in close proximity in the workplace. Unfortunately, in this case, after the Complainant, Susan Joyce, broke up with her former live-in boyfriend (John Carpenter), their relationship at work became increasingly acrimonious, with each of them accusing the other one of workplace harassment. Eventually, after being repeatedly disciplined for engaging in what the Company considered indirect forms of harassment towards Carpenter in violation of a no-contact order that applied to both her and Carpenter, Joyce was terminated from her employment, after 25 years of otherwise exemplary service. After her termination, Joyce filed a grievance through the Union regarding her termination, in an effort to get her job back, but those efforts were ultimately unsuccessful.

In connection with the above events, the Complainant filed three complaints with the Equal Rights Division ("ERD"), two against the Company and one against the Union.

In her first complaint against the Company, she alleged that it had discriminated against her based on her sex with regard to the first three disciplinary actions that it had issued against her; in her second complaint against the Company, she alleged that it had discriminated against her on the basis of sex, and had retaliated against her for filing the first complaint, with regard its decision to terminate her employment. In her third complaint, the Complainant alleged that the Union had denied her proper union representation based on her sex.

All three complaints were heard together at a six-day consolidated hearing. After reviewing all of the evidence that was presented at the hearing, the Administrative Law Judge ("ALJ") has concluded that the Complainant failed to meet her burden of proof in any of her three cases. With regard to the Complainant's two cases against the Company, the basis for that conclusion is discussed below.[30]

I.     Background.

After Joyce and Carpenter's relationship ended, they still had to work together, not only in the same workplace but in the same small work group, with Joyce operating one machine (the thread roller) and Carpenter operating another machine (the band saw), which were only a few feet apart. Additionally, as the Process Group Leader ("PGL") for their group, Joyce was responsible for scheduling and overseeing the workflow in their group, which meant that she would need to interact with Carpenter on a regular basis as part of her PGL responsibilities. However, as their personal relationship deteriorated, and they became increasingly angry at each other for a host of personal reasons,[31] they let it all but destroy their working relationship. As detailed in the findings of fact, they each accused the other one of engaging in harassing conduct that made their respective work lives miserable. Their continual feuding and sparring in the workplace also began to bother other employees who were distracted by their constant arguing and who felt that they were being asked to take sides. The Company began to see their relationship as a significant workplace disruption that needed to be addressed.

The Company (along with the Union) tried various ways to try to separate Joyce and Carpenter, asking each of them if they would consider moving to second shift, but neither one was willing to do that, nor was either one willing to take a position in another area of the plant, since the positions they could have moved to apparently paid less than their current positions. The Company then took a series of steps trying to keep them apart as much as possible, which applied equally to both Joyce and Carpenter.

First, in February of 2013, after Joyce complained to their mutual supervisor, Tim Dove, that Carpenter had been yelling and swearing at her in the workplace, Dove

---

[30] As noted in the procedural introduction to this decision, the ALJ is issuing a separate decision today in the Complainant's case against the Union.

[31] A lot of the hostility between Joyce and Carpenter arose from financial disputes related to the division of property they had once shared; they also had disputes related and to a second mortgage that Joyce had taken out to loan money to Carpenter. At some point, Carpenter stopped making payments on the loan.

called a special meeting with both of them.  At the meeting, he asked them both to agree to stop harassing each other and to generally avoid contact with one another as much as possible. The Complainant asked how she could perform her responsibilities as a PGL if she could not communicate with one of her group members, but Dove told her that he would act as a go-between, and that she could communicate with Carpenter through him. One issue that was never resolved at hearing was whether the agreement was ever put into writing or if it was just an oral agreement. But either way, both Carpenter and the Complainant understood that if they violated their agreement and continued to engage in conduct that bothered the other one, they would be subject to disciplinary action.

Then, in early May of 2013, Carpenter complained to his supervisors that he felt that the Complainant was still harassing him at work in a variety of ways.  After he was told to put his complaint in writing, he did so, submitting a written harassment complaint to management.  In July of 2013, Don Ritt, an HR manager, investigated the complaint, and met with both the Complainant and Carpenter.  Ritt understood that both of them had complaints about the other one, and he thoroughly questioned each of them to hear their respective sides of the story.  At the end of his investigation, he concluded that neither one had engaged in "harassment" in violation of the law but that were both were engaging in conduct that aggravated the other one, and that disrupted the workplace. At that point, he decided not to impose disciplinary action on either one.  However, in letters that he gave to both of them on July 30, 2013, he sternly warned them that if they did not stop engaging in their disruptive conduct toward each other, they would be subject to disciplinary action.

On July 25, 2013, just a few days before Ritt gave his letters to Joyce and Carpenter, James Kaplinski, the Operations manager, prepared a written order that he intended to give to both the Complainant and Carpenter. Kaplinski was concerned had about the ongoing conflicts between Joyce and Carpenter, and he hoped that his order would put a stop to it. The "direct order," which had signature lines for both Joyce and Carpenter, stated the following:

> YOU ARE TO HAVE NO DIRECT OR INDIRECT CONTACT OR COMMUNICATION WHATSOEVER WITH EACH OTHER AS LONG AS YOU ARE EMPLOYED BY MILWAUKEE CYLINDER.  ALL QUESTIONS ARE TO BE ADDRESSED BY YOUR SUPERVISOR.

The order further stated that failure to comply with the direct order would be considered a violation of the following rule: "Failure to comply with a direct order of a supervisor, except when there is a legitimate question of personal safety involved." Kaplinski asked the supervisor, Tim Dove, to give copies of the order to both Joyce and Carpenter, and to have both of them sign the order. Although Kaplinski never received signed copies of the order, and he never asked Dove to confirm that he had actually delivered the orders as instructed, Kaplinski assumed that both Joyce and Carpenter were given copies of the order.[32]  However, on December 19, 2013, Kaplinski re-issued

---

[32] The most hotly contested issue at hearing was whether Joyce actually received a copy of the direct order, which is contained in Exhibit MC-3.  That issue will be discussed below.

his no-contact order, and that time he made sure that this time both Joyce and Carpenter signed the order.[33]

As detailed above in the Findings of Fact, after the no-contact order was issued, the Company issued five disciplinary actions against the Complainant over the course of the next several months for violating the order. Under the Company's disciplinary policy, each successive violation received a harsher form of discipline, starting with a one-day layoff and culminating with termination.

In each instance, the Company considered Joyce's conduct to amount to a form of "indirect" harassing contact – conduct that it believed was intended to either aggravate Carpenter or to make him look bad in the eyes of management, by saying or doing things that cast aspersions on his productivity and attendance. The five disciplinary action that were given to Joyce are summarized below:

- July 29, 2013. Discipline for turning off Carpenter's radio when he left his work station for a break (One-day layoff).

- August 5, 2013. Discipline for complaining to her supervisor that Carpenter had only produced one tube and that he kept leaving his work station to go to other areas of the shop (Three-day layoff).

- November 4, 2013. Discipline for complaining to her supervisor that Carpenter had not cleaned up their work area, when she could have cleaned up the area herself; for admitting to "watching" Carpenter for 30 minutes; and for telling her supervisor that she had observed Carpenter just "sitting around and eating candy." (Five-day layoff).

- December 19, 2013. Discipline for suggesting to another employee (Jeffrey Pollnow) that he should go to management to complain about Carpenter's lack of productivity, which he did). (Five-day layoff).[34]

- May 2, 2014. Discipline for asking an industrial engineer to conduct an efficiency study on the band saw machine (Carpenter's assigned machine), after telling the engineer that Carpenter had only produced six tubes that day, whereas she typically cut 200 pieces a day. (Termination).

II.    Sex Discrimination.

To establish her claim of sex discrimination, Joyce needed to prove as part of her case that the Respondent treated her more adversely than it treated her male comparator, i.e., John Carpenter, under similar circumstances. However, the Complainant failed to do that. As summarized above, the Company initially treated her

---

[33] The re-issued order is contained in Exhibit MC-11.
[34] This discipline would have resulted in Joyce's termination but for the fact that after a mediation session held on December 10, 2013, the Company agreed to move her disciplinary record back one step, giving her an extra "chance" before terminating her.

and Carpenter even-handedly in its efforts to defuse their workplace conflicts. In February of 2013, after Joyce complained about Carpenter harassing her, their mutual supervisor met with both of them in February of 2013 and instructed both of them to keep away from each other. Then, in May of 2013, after Carpenter filed an internal harassment complaint against Joyce, the Company investigated his allegations, but also investigated her countervailing allegations against him; at the end of the investigation, the Company decided not to discipline either one of them, but issued both of them stern warnings to stop their mutually harassing conduct. And on July 25, 2013, it gave both of them the same no-contact order.

After July 25, 2013, of course, the Company *did* treat Joyce more adversely than Carpenter, disciplining her for violations of the no-contact order but not disciplining him. However, after that date Joyce and Carpenter were no longer "similarly-situated" for purposes of this case. That is because after that date, Joyce repeatedly engaged in conduct that the Company believed to be in violation of the no-contact order; by contrast, there was no evidence that Carpenter ever violated the no-contact order, either directly or indirectly, or, if he did, that the Company was ever made aware of that conduct.[35] Nonetheless, Joyce argued in her briefs that the ALJ should conclude that the Company's stated basis for disciplining her (and not Carpenter) was merely a pretext for sex discrimination. However, her argument does not stand up to scrutiny, as discussed below.

Joyce's argument is a rather conspiratorial one, based on an assertion that the Company (in cahoots with the Union) wanted to protect Carpenter and to get rid of her. To do that, she alleged, the Company kept disciplining her for violations of a direct order that they claimed had been issued on July 25th ordering her not engage in any "direct or indirect" contact with Carpenter; yet, according to Joyce, the *Company never actually issued such an order* According to Joyce, the order that Kaplinski testified he issued on July 25, 2013 (which is contained in Exhibit MC-3) is a fake document that was only created after the fact, as part of this litigation, to make it look like the Company had a basis for disciplining her. The ALJ does not find that theory to be at all credible, for a number of reasons.

Although the order contained in Exhibit MC-3 is unsigned (Kaplinski admits he was remiss in not following up after he issued it to make sure that he got back a signed copy), Kaplinski credibly testified that he did in fact issue it and that he instructed supervisor Tim Dove to give copies of the order to both Joyce and Carpenter and to ask them to sign it. His testimony is supported by the fact that every memo he subsequently gave her in response to her grievances directly quoted from his order of July 25th. For example, in the memo that he gave her on September 6th denying her grievance regarding the discipline that she had received on July 29th, he wrote (emphasis added): "***I find you have violated a direct order from a supervisor which was 'You are to***

---

[35] Joyce herself provided only one example of alleged harassment by Carpenter after February of 2013, i.e., an incident on July 10, 2013, when she claimed that he approached her during her lunch break to warn her that she needs to "watch it" because she was going to be moved to second shift and he would get her job (see recounted in Finding of Fact No. 92, above). However, that incident occurred two weeks *after* the issuance of the July 25th no-contact order.

**have no _direct or indirect contact_ or communication whatsoever with John Carpenter as long as you are employed by Milwaukee Cylinder ...**"

In addition, Joyce's testimony at hearing that she never saw the document in Kaplinski's July 25th order (Exhibit MC-3) until the attorneys for the Company showed it to her during the course of litigation was simply not credible, for reasons thoroughly discussed in the Company's initial post-hearing brief.[36]

But even if one were to credit Joyce's assertion that she never saw the Kaplinski's direct order of July 25th, she admitted in her testimony that after meeting with Dove and Carpenter in February of 2013, and after receiving Ritt's letters of July 30, 2013, she knew that she was under orders to avoid all contact Carpenter, and that if anything needed to be communicated with him as part of her role as a PGL, she needed to go through her supervisor.  She also knew, even if she never saw Kaplinski's July 25th order, that she was supposed to avoid "indirect" as well as "direct" contact with Carpenter, since, as noted above, Kaplinski quoted the "direct and indirect" language in all of his replies to Joyce's grievances.

Further, although Joyce claimed that she never understood what "indirect" contact meant, she was repeatedly told by management that in addition to not talking directly to Carpenter, she was not supposed to spend time doing such things as monitoring  his performance or complaining to management about his productivity, his attendance, or the amount of time he spent away from his work station, induce other employees to complain about Carpenter – all forms of conduct that the Company considered to be "indirect" ways of harassing Carpenter, inasmuch as they were precisely the types of harassing conduct that Carpenter had accused Joyce of in his written harassment complaint.[37]

In any event, regardless of what Joyce understood as to the type of conduct towards Carpenter she was supposed to avoid, the ALJ has concluded that the Company disciplined her for conduct that it genuinely believed was in violation of the no-contact order (both the original one issued on July 25 2013 and the follow-up order issued on December 19, 2013, which Joyce signed), and that her gender was not a factor in any of its disciplinary decisions.

---

[36] See Respondent's brief at pp. 8-13. Among other things, the brief cites passages from the Complainant's deposition where she admitted getting a copy of Kaplinski's July 25th order sometime soon after it was issued.  In addition, the brief notes that in her July 31st grievance, Joyce made reference to a "no contact rule."

[37] See Exhibit MC-4, which contains Carpenter's harassment complaint.  In retrospect, the ALJ believes that it would have been beneficial for the Company to have provided Joyce with a copy of the complaint. The ALJ understands that the Company did not want to show it to her because they thought it would just upset her and make matters worse between her and Carpenter.  However, if Joyce had seen it, she would have then had more insight into what it was she was doing that Carpenter considered to be forms of harassment ; she would have also had a better understanding of what types of conduct the Company wanted her to stop engaging in.  For example, one of the forms of harassment that Carpenter mentioned in his complaint was that she "would go to [the] supervisor stating production issues that didn't exist."  It does not appear that Joyce understood that complaining about his productivity was considered a form of "indirect" harassment until she received her first disciplinary action for doing just that.

III. Retaliation.

The ALJ has also concluded that Joyce failed to prove her claim that the Company terminated her in May of 2014 to retaliate against her for filing her first ERD complaint against the Company in November of 2013, because she failed to prove a causal nexus between the filing of the complaint and the decision to terminate her employment six months later.

First, as the Company noted in its post-hearing brief, the mere fact that a termination occurred following the filing of a complaint, is not sufficient by itself to prove causation; if it were, all terminations occurring after protected activity would be considered retaliatory, even if the protected activity did not play any role in the termination.

Second, in this case, six months passed between the protected activity (the filing of the complaint) and the adverse employment action (the termination), a significant amount of time, which does not lend support to a finding of retaliation. In *Gephart v. Dept. of Corrections* (LIRC, 11/18/2009), the Labor & Industry Review Commission ("LIRC"), the agency that hears appeals of cases under the WFEA, held that "as the period of time separating the two events lengthens, the hint of causation [between the two] weakens."

Third, as the Company also noted in its brief, Joyce's own conduct in this case breaks the chain of causation between the protected activity and the adverse employment action. In other words, after Joyce filed her charge, she continued to engage in conduct that the Company considered to be in violation of the no-contact order, and it was the same type of conduct that the Company had already disciplined her for a number of times before it received her ERD complaint. This supports the conclusion that the Company disciplined her for her conduct, not because of her ERD complaint. See, e.g., citing *Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012)(employee's own inappropriate workplace behavior broke any chain of causation).

cc:    Complainant
       Respondent
       Larraine McNamara-McGraw and Lilah J. Zajac, Attorneys for Complainant
       David J. Hanus and Elizabeth A. Odian, Attorneys for Respondent
       EEOC